IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| Arturo Garza, LaQuinta Jones, and Doris Morales; Individually, and on behalf of all others similarly situated, | Civil Action File No._____ |
| Plaintiffs, | Jury Trial Demanded |
| v. | |
| Herrman & Herrman, PLLC, Greg Herrman, Steven C. Stratso, Kyzmyck Byerly, Rodney Glenn, Hector Luna, and Does 1 through 100, | |
| Defendants. | |

## ORIGINAL CLASS ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL

COME NOW PLAINTIFFS, Arturo Garza, LaQuinta Jones, and Doris Morales, individually and on behalf of a class of other similarly situated individuals, by and through counsel of record, and bring this class action complaint against Herrman & Herrman, PLLC ("H&H"), Greg Herrman, Steven C. Stratso, Kyzmyck Byerly, Rodney Glenn, Hector Luna, and Does 1 through 100 (specifically unknown associates and/or employees of H&H) (collectively

"Defendants") based upon their fraudulent billing and collection practices netting them hundreds of thousands of dollars in illicit, hidden profit from unsuspecting clients and based on their unlawful contracting to retain exclusive control over their clients' ability to settle claims. Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by Plaintiffs' attorneys.

## INTRODUCTION

1.     This is a case of egregious attorney misconduct giving rise to civil liability under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 *et seq*. For nearly three years, Greg Herrman, managing partner of H&H, aided by associates and employees, systematically defrauded clients out of more than $600,000 through fraudulent billing practices in cases resolved without litigation. The scheme works as follows:

2.     For the last three years, Herrman attorneys and staff have signed up clients while representing to them that, for pre-litigation cases, they will be charged a $195 administrative flat fee to cover copies, postage, long-distance phone calls, scanned documents, faxes, and miscellaneous supplies.

3.      They sell the "administrative fee" as a cost-saving measure for clients. Specifically, the representation agreement, prepared by Herrman and his attorneys and staff, informs clients that, unlike prelitigation clients who pay only $195, clients who file suit must pay "all expenses."[1] The representation agreement leaves the client with the impression that the $195 "administrative fee" is designed to save pre-litigation clients money.

4.      In fact, the "administrative fee" is anything but a benefit to the client. Administrative expenses in prelitigation cases are almost always a tiny fraction of the $195 "administrative fee."

5.      For example, Herrman and his associates charged client, LaQuinta Jones, the $195 "administrative fee" when actual administrative expenses were $18.60.[2] They charged client, Arturo Garza, $195 when actual administrative

_____

[1] Ex. 1 at 1, July 8, 2019 H&H Representation Agreement with Arturo Garza; Ex. 2 at 1, September 20, 2019 H&H Representation Agreement with Arturo Garza; Ex. 3 at 1, November 11, 2019 H&H Representation Agreement with LaQuinta Jones; Ex. 4 at 1, September 20, 2019 H&H Representation Agreement with Doris Morales.

[2] Ex. 5 at 5–6 (supplemental answer to interrogatory 9), *LaQuinta Jones v. Greg Herrman Attorney at Law & Herrman & Herrman PLLC,* H&H's First Supplemental Answers to Plaintiff LaQuinta Jones' First Set of Interrogatories, Case No. 2021DCV-2168-C (94th Dist. Ct. Nueces County, Texas). $15.00 of the administrative expenses for Jones were characterized as "Contract/file/calls

expenses were $18.22.[3] And they charged Doris Morales $195 when actual administrative expenses were $7.55.[4]

| Client | "Administrative Fee" | Actual Administrative Expenses | Profit | Markup |
|---|---|---|---|---|
| LaQuinta Jones | $195 | $18.60 | $176.40 | 1,048% |
| Arturo Garza | $195 | $18.22 | $176.78 | 1,070% |
| Doris Morales | $195 | $7.55 | $187.45 | 2,582% |

6.     Herrman and his associates have many years of experience as personal injury attorneys and have resolved thousands of personal injury cases.[5] They know actual administrative expenses for prelitigation clients rarely approach anything close to $195. In most cases, the "administrative fee" represents a 1000% to 2000% markup of actual expenses.

---

expense" and appear to be just a flat fee expense. Thus, the actual administrative expenses for Jones are actually likely even less.

[3] Ex. 6, May 20, 2020 email from Steven Stratso.

[4] *Id*.

[5]   https://www.herrmanandherrman.com/texas-personal-injury-law-firm/   (last visited Feb. 2, 2022) ("With over 100 years of combined experience among the legal team of Herrman & Herrman, P.L.L.C., our Texas personal injury attorneys have successfully resolved over 20,000 cases").

4

7.     Herrman and his associates deliberately conceal from their clients the truth behind the "administrative fee"—*that it is pure profit on expenses.*

8.     They never advise their clients, verbally or in writing, that the "administrative fee" is actually profit for Defendants. To the contrary, they lead their clients to believe that the $195 is not just a reasonable charge for administrative expenses, it actually saves them money.

9.     They also do not tell their clients that some of the so-called expenses covered under the "administrative fee" are not expenses at all. For example, H&H does not pay for long-distance phone calls. Yet, they represent this cost as part of the cost-savings of the $195 "administrative fee."

10.     These fraudulent billing practices and misrepresentations violate the Texas Disciplinary Rules of Professional Conduct;[6] specifically, Rule 1.04's obligation to communicate the basis of a rate or fee to the client, and Rule 8.04(a)(3)'s prohibition against engaging in conduct involving dishonesty, fraud, deceit or misrepresentation. *See* Professional Ethics Committee for the State of

---

[6] "[T]he Texas Disciplinary Rules of Professional Conduct" set "the minimum standard of practice" in the Southern District of Texas. LR, Rules of Discipline, Appendix A, Rule 1A.

Texas: Opinion 594 (Feb. 2010).[7] Under the rules of ethics, it is questionable whether a markup on expenses is permitted at all since "[t]he lawyer's stock in trade is the sale of legal services, not photocopy paper, tuna fish sandwiches, computer time or messenger services." A.B.A. Formal Op 93-379 at 7 (Dec. 1993).[8] But what is unquestionably *not* allowed is attorneys profiting on expenses without "the client underst[anding] and accept[ing] that the amounts billed by the lawyer for expenses would include this additional compensation." Texas Ethics Opinion 594;[9] *see also* A.B.A. Formal Op 93-379;[10] *cf. Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 450 (Tex. 2011) (part of lawyer's fiduciary duty to a client "is to inform the client of all material facts"); *Levine v. Bayne, Snell*

---

[7] Ex. 8, Professional Ethics Committee for the State of Texas: Opinion 594 (Feb. 2010), https://legalethicstexas.com/Ethics-Resources/Opinions/Opinion-594.

[8] Ex. 7, A.B.A. Formal Op 93-379 (Dec. 1993).

[9] Ex. 8 at 2. "Billing more for expenses than the amount paid by the lawyer without disclosing that fact would constitute a violation of the requirements of Rule 1.04(c) and Rule 1.03(b) in that the lawyer would not have communicated accurately to the client the basis for the billing." In addition, … in the absence of disclosure and agreement to the contrary, charging, collecting or recouping more for a third-party expense than the amount actually paid by the lawyer would violate the prohibition of Rule 8.04(a)(3) against engaging in conduct involving dishonesty, fraud, deceit or misrepresentation." *Id*. (emphasis added).

[10] Ex. 7.

*& Krause, Ltd.*, 40 S.W.3d 92, 96 (Tex. 2001) ("one facet of a lawyer's duty to the client … [is] to inform a client of the basis or rate of the fee at the outset of the matter" and the attorney has the obligation to clarify agreements since the attorney has "greater knowledge and experience with respect to fee arrangements and because the trust [the] client has placed in [the attorney]") (quotation omitted).

11.     Not only does this fraudulent scheme violate the rules of ethics, but it constitutes wire fraud under 18 U.S.C. § 1343 because Herrman and his associates send interstate faxes and emails in furtherance of the scheme. As a matter of routine practice, Herrman and his associates use email and faxes in its efforts to collect the fraudulent $195 "administrative fee" from insurers. Their repeated wire fraud is part of a wider pattern of racketeering activity to collect the fraudulent "administrative fee."

12.     While the $195 charge might appear modest on an individual basis, Herrman and his Firm book enormous profits through volume. They sign up 30 to 45 clients per week,[11] netting them hundreds of thousands of dollars in fraudulent "administrative fees," all in violation of RICO, the rules of ethics, and other laws.

_____

[11] Ex. 9, Deposition of Hector Luna at 32.

13.     In fact, based on a model that assumes the same mark-up percentage

from Plaintiffs' cases, Defendants over the last three years, have fleeced their

clients of more than $600,000.00. This amount continues to grow because Herrman

and his associates still charge the "administrative fee."

| Estimated Potential Clients Charged Admin. Fees[12] | Estimated Charges for Admin. Fees[13] | Estimated Actual Admin. Expenses[14] | Profit | Markup[15] |
|---|---|---|---|---|
| 3,510 | $684,450 | $51,912.90 | $632,537.10 | 1,218% |

14.     Herrman and his associates don't stop there. They exploit their clients

by leveraging their position of trust and getting their clients to sign a contract that

strips them of the ability to settle their claims without H&H's approval.[16]

---

[12] Based on Luna's testimony that H&H signs up to 45 clients per week (Ex. 9 at 32), that is up to 2,340 clients per year, or 7,020 over an approximate three years (March 2019 to present). Conservatively estimating that half of these clients settle without filing suit, that is 3,510 clients assessed the $195 "administrative fee" since March 2019.

[13] 3,510 x $195 = $684,450.

[14] $18.60 + $18.22 + $7.55 = $44.37 / 3 = $14.79 average actual administrative expense for the named plaintiffs. $14.79 x 3,510 =$51,912.90.

[15] $632,537.10 profit/ $51,912.90 cost = 12.18 X 100% = 1218% markup.

[16] Ex. 1 at 2 ¶c; Ex. 2 at 2 ¶c; Ex. 3 at 2 ¶c; Ex. 4 at 2 ¶c.

15.     Since at least July 2019, Herrman and his associates have required that their clients forfeit one of the most important rights a client has—deciding under what terms to settle claims.[17]

16.     Even if a client decides a proposed settlement is in his or her best interest, he or she cannot settle unless Herrman and his associates are satisfied with their contingency fees and give their approval. *See In re Plaza*, 363 B.R. 517, 521-22 (Bankr. S.D. Tex. 2007) ("giving an attorney decision making power over whether to settle a case or proceed to trial, could force a litigant to hazard the outcome of litigation in order to secure a higher contingency fee for the attorney").

17.     This provision also violates the Texas Disciplinary Rules of Professional Conduct and renders the representation agreements void as against public policy. *See* Tex. Disciplinary R. Prof'l Cond. 1.02(a)(2) & cmt 5 ("the client may not be asked … to surrender … the right to settle"); *In re Plaza*, 363 B.R. at 521 ("A clause in a retainer agreement prohibiting the client from settling without the attorney's consent is void as against public policy") (quoting ABA Comm. On Ethics and Prof'l Responsibility, Formal Op. 326 (1970) (quoting Henry S. Drinker,

---

[17] Ex. 1 (July 8, 2019 agreement containing the provision giving H&H "complete" control over settlement).

Legal Ethics, 101 (Columbia Univ. Press 1953)); *see also Lewis v. S.S. Baune*, 534 F.2d 1115, 1122 (5th Cir. 1976) ("[c]lauses in a contract between attorney and client which prohibit a settlement by the client without his attorney's consent are generally held to be unenforceable as against public policy"). Consequently, every Herrman contract since at least 2019 is void because of the inclusion of this unlawful provision.

18.    Apart from the obvious profit motive, why would Herrman and his associates take such enormous risks? The answer, at least in part, is that they know their clients won't notice. As one H&H employee testified: "It is usually rare, but every now and then we'll get maybe an upper middle class, educated person that wants to look at the contract and has tons of questions or somebody that's really finicky, but I can probably count those on one hand a year."[18] In fact, this happens "maybe once a year."[19]

19.    Indeed, this fraudulent scheme surfaced only after a succession of clients fired H&H and retained the undersigned counsel to handle their claims.

---

[18] Ex. 9 at 53.

[19] *Id*.

These former H&H clients filed individual lawsuits in state court, but when more clients came forward with the same unlawful provisions in their representation agreements, and when it later became clear that actual administrative expenses are almost always a tiny percentage of the $195 "administrative fee," a pattern of fraud and racketeering emerged. Rather than concede their improprieties, H&H dug in its heels and adopted a scorched-earth mentality in its efforts to collect the $195 "administrative" fee through the fraudulent use of interstate wires.

20.    This lawsuit is brought on behalf of Plaintiffs Garza, Jones, and Morales, and on behalf of all former H&H clients who collectively sustained hundreds of thousands of dollars in damages from Herrman & his associates' scheme to charge or attempt to collect the fraudulent $195 "administrative fee" in violation of RICO and other laws. It also seeks to disgorge H&H, Herrman, and his associates of attorneys' fees they received by illegally contracting for absolute veto power over settlements in violation of clear public policy against that practice.

## PARTIES

21.    Plaintiffs and the Class incorporate by reference the foregoing allegations as if fully set forth herein.

22.     Plaintiff Arturo Garza is a natural person and a Texas citizen, residing in Corpus Christi, Nueces County, Texas. He is a former H&H client.

23.     Plaintiff LaQuinta Jones is a natural person and a Texas citizen, residing in Corpus Christi, Nueces County, Texas. She is a former H&H client.

24.     Plaintiff Doris Morales is a natural person and a Texas citizen, residing in Corpus Christi, Nueces County, Texas. She is a former H&H client.

25.     Defendant Greg Herrman is a natural person and a Texas citizen, residing in Corpus Christi, Nueces County, Texas. He is a licensed Texas attorney. He is H&H's managing partner. He may be served with process at his usual place of business at 1201 3rd Street, Corpus Christi, Texas 78404.

26.     Defendant Steven C. Stratso is a natural person and a Texas citizen, residing in Nueces County, Texas. He is a licensed Texas attorney. He is an H&H associate and may be served with process at his usual place of business at 1201 3rd Street, Corpus Christi, Texas 78404.

27.     Defendant Kyzmyck Byerly is a natural person and a Texas citizen, residing in Nueces County, Texas. She is a licensed Texas attorney. She is an H&H associate and may be served with process at her usual place of business at 1201 3rd Street, Corpus Christi, Texas 78404.

28.    Defendant Rodney Glenn is a natural person and a Texas citizen, residing in Nueces County, Texas. He is an H&H employee and may be served with process at his usual place of business at 1201 3rd Street, Corpus Christi, Texas 78404.

29.    Defendant Hector Luna is a natural person and a Texas citizen, residing in Nueces County, Texas. He is an H&H employee and may be served with process at his usual place of business at 1201 3rd Street, Corpus Christi, Texas 78404.

30.    Defendant Herrman & Herrman, PLLC ("H&H") is a professional limited liability company incorporated and existing under the laws of the State of Texas with its principal place of business at 1201 3rd Street, Corpus Christi, Texas 78404. It may be served with process through its managing partner, Greg Herrman, at 1201 3rd Street, Corpus Christi, Texas 78404.

31.    Certain individuals or entities, other than the specifically named and identified Defendants, may have been involved in the misconduct alleged herein, and those potential defendants being currently unknown to the Plaintiffs are designated as Does 1 through 100.

## JURISDICTION AND VENUE

32.    Plaintiffs and the Class incorporate by reference the foregoing allegations as if fully set forth herein.

33.    18 U.S.C. § 1964(c) creates the civil RICO private cause of action. As such, Plaintiffs' RICO claim[s] arise under the laws of the United States and this Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

34.    This Court also has federal question jurisdiction over this matter under the Declaratory Judgment Act, 28 U.S.C. § 2201.

35.    This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. §1367. The Plaintiffs' state law claims are so related to their claims under RICO (18 U.S.C. §§ 1961, *et seq*) that they form part of the same case or controversy under Article III of the United States Constitution.

36.    In the alternative, the Court has original jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332(d)(2) because (a) at least one member of the putative Class is a citizen of a state different from a Defendant, (b) the amount of controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

37.     This Court has personal jurisdiction over all Defendants pursuant to 18 U.S.C. § 1965(a) insofar as each Defendant resides in Texas in this District and each conducts business and transacts affairs in Texas in this District.

38.     Venue is proper in this District under 18 U.S.C. 1965(a) because it is where Defendants reside, are found, and transact their affairs.

39.     Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) insofar as at least one Defendant resides in this District and all Defendants are Texas residents.

40.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

<u>FACTS COMMON TO ALL COUNTS</u>

41.     Plaintiffs and the Class incorporate by reference the foregoing allegations as if fully set forth herein.

I.    **Since March 2019, Defendants have executed their Administrative Fee Scheme by misrepresenting a $195 "Administrative Fee" as a cost-saving benefit when it is actually undisclosed profit on expenses.**

42.    Since at least March 27, 2019, H&H has charged its pre-litigation clients a $195 "administrative fee."[20]

43.    H&H managing partner, Greg Herrman, directed and continues to direct his associates and employees to sign-up prelitigation clients using a standard representation agreement.[21]

44.    Each client was required to execute the standard representation agreement.

45.    Generally, the standard representation agreement memorialized the attorney-client relationship between the client and H&H and its lawyers; defined the scope of and the terms under which H&H and its lawyers would provide the

---

[20] Ex. 10 at 3, H&H's Fourth Supplement to Objections and Answers to Plaintiff Dorris Morales' First Set of Interrogatories, Case No. 2020DCV-1662-H (347th Dist. Ct. Nueces County, Texas). According to H&H, on September 20, 2018, they initially "started charging $395.00 as the administrative fee … but only collected $195.00 at the end of the settlement." *Id*.

[21] *Id*. at 5, Second Supplemental Response to Interrogatory 4 ("The $195 administrative flat fee was decided by Greg Herrman, manager of Herrman & Herrman, PLLC").

client legal services; and specified the fees and expenses clients would be charged for those services.

46.     Since at least March 2019—and perhaps even earlier—Herrman, his associates and employees, and H&H used the same standard representation agreement to sign up clients.

47.     Every representation agreement since at least March 2019 informs clients of a flat $195 "administrative fee" that would completely cover all administrative costs as long as their case was resolved without filing suit.[22]

48.     The representation agreement states that:

> "[e]ach client whose case is settled <u>without filing a lawsuit</u> will be assessed an administrative fee of $195.00 to cover expenses for the following: black and white photocopies, postage, long distance phone calls, scanned documents, facsimiles, and other miscellaneous supplies."[23]

49.     Defendants knew that the $195 fee would be many multiples of *actual* administrative expenses in the vast majority of prelitigation cases. Indeed, in the

---

[22] Ex. 1 at 1; Ex. 2 at 1; Ex. 3 at 1; Ex. 4 at 1.

[23] *Id*. (emphasis original).

case of Plaintiffs Jones, Garza, and Morales, more than 90% of the "administrative fee" is pure profit for Defendants.

50.     They also knew that there is no actual cost incurred for some of the items covered by their "administrative fee," including long-distance phone calls. Nevertheless, Defendants represented and continue to represent that the $195.00 was and is a reasonable "administrative fee."

51.     Defendants informed clients through the representation agreement that the $195 "administrative fee" was a cost-savings measure that was a benefit to them.

52.     Critically, Defendants *never* informed the clients that the "administrative fee" is mostly profit. To the contrary, they created the false belief in their clients that the "administrative fee" is a cost-saving benefit to them.

53.    The agreement, prepared by Greg Herrman and/or his associates, represents that unlike pre-litigation clients who are capped at $195, clients who file a lawsuit if a lawsuit:

> "will not incur this fixed charge, but will be charged for **all expenses**, including the above expenses, incurred in the prosecution of the case."[24]

54.    The client is left with the impression that when a lawsuit is not filed, he or she will save money by not being charged for all actual expenses.

55.    In fact, unbeknownst to the client, the "administrative fee" is concealed as a cash-grab by Defendants.

56.    The law prohibits attorneys from profiting on costs without first fully informing their clients.

57.    Indeed, both the disciplinary rules of the American Bar Association and Texas Bar Association forbid attorneys from collecting profit on expenses without *express disclosure of the profit* to the client. Tex. Disciplinary Rule Prof'l Conduct R. 1.04(c); ABA Op. 93-379;[25] Texas Ethics Op. No. 594.[26]

---

[24] Ex. 1 at 1; Ex. 2 at 1; Ex. 3 at 1; Ex. 4 at 1 (emphasis original).
[25] Ex. 7.

[26] Ex. 8.

58.     Further, Texas holds its "attorneys to the highest standards of ethical conduct in dealing with their clients. The duty is highest when the attorney contracts with his or her client or otherwise takes a position adverse to his or her client's interest." *Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 561 (Tex. 2006) (quoting *Lopez v. Munoz, Hockema & Reed L.L.P.*, 22 S.W.3d 857, 868 (Tex. 2000)).

59.     "Lawyers have a duty, at the outset of the representation, to 'inform a client of the basis or rate of the fee' and 'the contract's implications for the client.'" *Hoover*, 206 S.W.3d at 565 (quoting *Levine v. Bayne, Snell & Krause, Ltd.*, 40 S.W.3d 92, 96 (Tex. 2001); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 38(1), (18)). The law imposes "the obligation of clarifying attorney-client contracts upon the attorneys" because of the attorney's "greater knowledge and experience with respect to fee arrangements and because of the trust [the] client has placed in the attorney." *Hoover*, 206 S.W.3d at 565 (quoting *Levine*, 40 S.W.3d at 95) (quoting *Cardenas v. Ramsey County*, 322 N.W.2d 191, 194 (Minn. 1982)) (alterations in original).

II. **Defendants conduct and participate in H&H's affairs by a pattern of racketeering activity—namely, the commission of wire fraud including the repeated use of emails, faxes, and phone calls to collect the fraudulent $195 "administrative fee" from out-of-state insurers.**

60.    Defendants' fraudulent "administrative fee" scheme does not stop with concealing profit in the guise of an "administrative fee." Rather, once they dupe their clients into signing the agreement containing the fraudulent fee, Defendants then "transmit"—by means of "wire communication," *e.g.*, emails, faxes, and phone calls—settlement demands to out-of-state insurers to collect it.

61.    Depending on the form of wire communication utilized by Defendants, these settlement demands take one of the following forms: "writings, signs, signals, pictures, or sounds."

62.    Additionally, H&H uses a case management software called FileVine, headquartered in Salt Lake City, Utah. All of Defendants' settlement demands sent via email were transmitted to FileVine's out-of-state servers and data storage centers.

63.    Defendants' fraudulent settlement demands contemplate collection of the $195 "administrative fee."

64.    Some of these fraudulent settlement demands specifically identify and demand payment of the $195 "administrative fee."

65.    Defendants transmit these fraudulent settlement demands for the very purpose of executing their "administrative fee" scheme to defraud their clients and the insurers out of their money and property.

66.    In addition to Defendants' transmitting *via* wire these fraudulent settlement demands to insurers, in cases where H&H was fired by their clients, Defendants often will transmit by interstate wire threats of attorneys' liens predicated on these fraudulent and illegal fees.

67.    Settlement negotiations and similar pre-litigation activities—including demands and threats of attorneys' liens—affect interstate commerce.

68.    Further, in some instances, Defendants have clients sign the representation agreement with the $195 "administrative fee" through AssureSign software.[27] AssureSign is an electronic signature software that can be deployed as a Software as a Service (SaaS) application or installed on customer premises. H&H employee Hector Luna directs H&H's answering service to use the AssureSign web-based platform for executing contracts with e-signatures.[28]

---

[27] Ex. 9, Deposition of Hector Luna at 62–65.

[28] *Id.*

69.     The use of the AssureSign platform and portal involves the transmission of client data and e-signatures across the internet and storage in servers located in data zones around the world, including locations in the United States.

70.     The AssureSign process is interstate wire communication that Defendants use to further their scheme to defraud their clients.

## III.    Defendants continue their pattern of racketeering activity, misappropriating hundreds of thousands of dollars from clients.

71.      Defendants continue to include the $195 "administrative fee" in all H&H representation agreements.

72.     Defendants continue not to advise their clients that the "administrative fee" is mostly profit for Herrman on expenses.

73.     Defendants continue to transmit *via* wire fraudulent communications with out-of-state insurers in furtherance of their scheme to defraud insurers and clients, and to ensure collection of their fraudulent and illegal "administrative fee."

74.     Defendants continue not to tell their pre-litigation clients that their actual costs are generally a tiny fraction of the $195 "administrative fee."

75.     Plaintiffs and other members of the proposed class have suffered damages in the form of the unlawful $195 administrative fee. Over a three-year

period, they have collectively sustained more than $600,000 in damages from these fraudulent billing practices.[29]

A.     Arturo Garza

76.     On July 8, 2019, Arturo Garza signed an H&H representation agreement at its offices in Corpus Christi, Texas, in connection with a motor-vehicle accident that occurred on July 6, 2019.[30]

77.     H&H associate, Stratso, signed the agreement on behalf of the Firm.[31]

78.     The agreement represented that if the case settled without litigation, Garza would be charged an "administrative fee" of $195 to cover expenses for "black and white photocopies, postage, long distance phone calls, scanned documents, facsimiles and other miscellaneous supplies."[32]

79.      Defendants knew, at the time of contracting, that Garza's expenses were unlikely to approach even 10% of that amount.

_____

[29] *Supra* ¶ 13.

[30] Ex. 1.

[31] *Id*. at 5.

[32] Ex. 1 at 1.

80.     Nobody within H&H ever informed Garza that the $195 "administrative fee" is mostly profit.

81.     The representation agreement also provided that his matter could *not* be settled without H&H's approval.[33]

82.     Defendants negotiated Garza's case with State Farm, an out-of-state insurer headquartered in Illinois. Defendants made a settlement demand for payment of the $195 administrative fee.

83.     The case settled on October 16, 2019; H&H collected $6,475 in attorneys' fees and Garza was charged the $195 fee despite incurring far less in actual expenses.[34] The final settlement statement was saved and stored on FileVine, transmitting the data over interstate wire.[35]

84.     The final statement did not itemize actual administrative expenses.[36]

---

[33] Ex. 1 at 2 ¶c.

[34] Ex. 11, H&H settlement breakdown for settlement of Garza's July 6, 2019 accident. Despite Garza's repeated requests, H&H refused to turn over other information from his file, including actual administrative expenses.

[35] *Id*.

[36] *Id*.

85.    Garza later signed another H&H representation agreement with Stratso in connection with a different motor vehicle accident—this one having occurred on September 20, 2019.[37]

86.    The representation agreement again provided that Garza would be charged the $195 "administrative fee" and that he could not settle his claims without H&H approval.[38]

87.    No one at H&H told Garza that the $195 "administrative fee" was mostly profit.

88.    The representation agreement, prepared by Herrman, his attorneys, and staff, informed Garza that, unlike prelitigation clients who pay only $195, clients who file suit must pay "all expenses."[39] Thus, H&H's representation agreement conveyed the $195 "administrative fee" as a benefit to Garza.

89.    On October 17, 2019, Garza fired H&H and hired the Bandas Law Firm, P.C. in connection with the September 20, 2019, motor vehicle accident.[40]

_____

[37] Ex. 2.

[38] *Id*. at 1.

[39] *Id*.

[40] Ex. 12, Garza termination letter.

90.    Garza fired H&H because it failed to communicate with him.[41]

91.    No H&H attorney performed material or beneficial work in his case over the twenty-seven-day period of representation.

92.    Though H&H had been on the case for twenty-seven days, it had done nothing, other than Stratso sending a fax on H&H's behalf to Progressive Commercial in Island Heights, Ohio on October 21, 2019.[42]

93.    The October 21, 2019 fax advised of H&H's interest in Garza's claim.[43]

94.    Stratso threatened to file suit if the insurer did not acknowledge the interest within five days.[44]

95.    On May 12, 2020, Stratso followed up with an email to Progressive employee, Kymber D. Fennell-Lewis, in Oklahoma City, again demanding payment and specifically explaining "that our expenses are $198 per client[.]"[45]

---

[41] *Id.*

[42] Ex. 13, Stratso Oct. 21, 2019 fax.

[43] *Id.*

[44] *Id.*

[45] Ex. 14, May 12, 2020 Stratso email.

96.    Stratso did so even though he and other Defendants knew that the administrative expenses were only $18.22.[46]

97.    Garza sustained injury in the form of legal expenses in having to fight Defendants' efforts to collect the fraudulent $195 administrative fee. Specifically, Garza incurred at least $1,300 in litigation expenses.

**B.    LaQuinta Jones.**

98.    LaQuinta Jones signed an H&H representation agreement at the Firm's offices in Corpus Christi, Texas on November 11, 2019, in connection with a motor vehicle accident that occurred on November 7, 2019.[47]

99.    H&H associate, Byerly, signed the agreement on behalf of the Firm.[48]

100.   As with Garza, Jones' H&H representation agreement provided that if the case settled without litigation, Jones would be charged an "administrative fee of $195 to cover expenses for the following: black and white photocopies,

---

[46] Ex. 6.

[47] Ex. 3.

[48] *Id*. at 5.

postage, long distance phone calls, scanned documents, facsimiles and other miscellaneous supplies."[49]

101. Defendants knew at the time of contracting that pre-litigation administrative costs are generally less than 10% of the $195 "Administrative Fee" imposed, and that it would be very unlikely that Jones' costs would approach a tiny fraction of $195.

102. Jones was never informed by anyone at H&H that the $195 "administrative fee" is mostly profit.

103. Defendants did not tell her that her actual costs may be—in fact, would likely be— less than the $195 "administrative fee."

104. Jones' representation agreement also provided that the case could not be settled without H&H's approval.[50]

105. Jones fired H&H on December 4, 2019 and hired the Bandas Law Firm to handle her personal injury claim.[51]

---

[49] *Id.* at 1.

[50] Ex. 3 at 2 ¶c.

[51] Ex. 15, Jones' termination letter.

106.   As with Garza, no H&H attorney communicated with her after she was signed up and the Defendants began to execute their "administrative fee" scheme.

107.   H&H represented Jones for 23 days and did not perform any material or beneficial work on her behalf.

108.   Nevertheless, H&H employee, Glenn, transmitted *via* U.S. wire a fax to a State Farm Insurance claims representative in Phoenix, Arizona on December 9, 2019.[52]

109.   The December 9, 2019 fax was a writing.

110.   The December 9, 2019 fax advised of H&H's intent to assert its full interest in attorney's fees and "office expenses of $195.00 in Laquinta Jones' claim."[53]

111.   Asserting and providing notice of an interest in attorneys' fees and "office expense expenses of $195.00 in Laquinta Jones' claim" with an out-of-state insurance claims representative is interstate commerce.

---

[52] Ex. 16, December 19, 2019 Glenn fax.

[53] *Id*.

112. Glenn, and other H&H employees knew, at the time it was transmitted, that the fax was fraudulent and knew that administrative expenses were only $18.60.[54]

113. Glenn transmitted the December 9, 2019 fax in furtherance of Defendants' scheme to defraud Jones by overcharging her for administrative costs.

114. Defendants' "administrative fee" scheme injured Jones because she was forced to incur expenses to fight Defendants' attempted collection of the fraudulent "administrative fee." Specifically, she has incurred at least $700 in litigation expenses. She was further injured in that Defendants' collection efforts delayed settlement. Although the undersigned firm had reached a tentative settlement with the adverse driver, settlement funds could not be released due to the assertion of Defendants' fraudulent lien for fees and expenses. Jones had to file a lawsuit against the adverse driver because the settlement could not be finalized prior to the running of the statute of limitations for the underlying motor vehicle collision.  To date, Jones still has been unable to receive her settlement.

---

[54] *See e.g.*, Ex. 5 at 5–6 (supplemental answer to interrogatory 9).

C.      **Doris Morales**

115.    Doris Morales signed an H&H representation agreement at the Firm's offices in Corpus Christi, Texas on September 20, 2019, in connection with a motor vehicle accident that occurred on the same date.[55]

116.    H&H associate, Stratso, signed the agreement on behalf of the Firm.[56]

117.    As with Garza and Jones, Morales' H&H representation agreement provided that if the case settled without litigation, she would be charged an "administrative fee of $195 to cover expenses for the following: black and white photocopies, postage, long distance phone calls, scanned documents, facsimiles and other miscellaneous supplies."[57]

118.    Defendants knew at the time of contracting that pre-litigation administrative costs are generally less than 10% of the $195 "administrative fee" imposed, and that it would be very unlikely that Morales' costs would approach a tiny fraction of $195.

---

[55] Ex. 4.

[56] *Id*. at 4; Ex. 11 at 41.

[57] Ex. 4 at 1.

119.  Morales was never informed by anyone at H&H that the $195 "administrative fee" is mostly profit.

120.  Defendants did not tell her that her actual costs may be—in fact, would likely be— less than the $195 "administrative fee."

121.  Morales' representation agreement also provided that the case could not be settled without H&H's approval.[58]

122.  Morales fired H&H on September 25, 2019 and hired the Bandas Law Firm to handle her personal injury claim.[59]

123.  As with Garza and Jones, no H&H attorney communicated with Morales after she was signed up and the Defendants began to execute their "administrative fee" scheme.

124.  H&H represented Morales for 5 days and did not perform any material or beneficial work on her behalf.

---

[58] Ex. 4 at 2 ¶c.

[59] Ex. 17.

125.   Though H&H had been on the case for 5 days, it had done nothing, other than Stratso sending a fax on H&H's behalf to Progressive Commercial in Island Heights, Ohio on October 21, 2019.[60]

126.   The October 21, 2019 fax advised of H&H's interest in Morales' claim.[61]

127.   Stratso threatened to file suit if the insurer did not acknowledge the interest within five days.[62]

128.   On May 12, 2020, Stratso followed up with an email to Progressive employee, Kymber D. Fennell-Lewis, in Oklahoma City, again demanding payment and specifically explaining "that our expenses are $198 per client[.]"[63]

129.   Stratso did so even though he and other Defendants knew that the administrative expenses were only $7.55.[64]

130.   The October 21, 2019 fax and the May 12, 2020 email were writings.

---

[60] Ex. 18, Oct. 21, 2019 Stratso fax regarding Morales' personal injury claim.

[61] *Id.*

[62] *Id.*

[63] Ex. 14.

[64] *See e.g.*, Ex. 6.

131.  Asserting and providing notice of an interest in attorneys' fees and demanding payment of $198 in administrative expenses with an out-of-state insurance claims representative is interstate commerce.

132. Stratso and other H&H employees knew at the time it was transmitted, that the fax was fraudulent and knew that administrative expenses were only $7.55.[65]

133.  Stratso transmitted the October 21, 2019 fax and the May 12, 2020 email in furtherance of Defendants' scheme to defraud Morales by overcharging her for administrative costs.

134.  Defendants' "administrative fee" scheme injured Morales because she was forced to incur expenses to fight Defendants' attempted collection of the fraudulent "administrative fee." Specifically, Morales incurred at least $1,300 in litigation expenses.

**IV. H&H and Defendants retain complete control over settling their clients' cases through an unlawful provision in the representation agreement.**

135.  Managing partner, Herrman, and his associates have also engaged in the unlawful practice of retaining complete control over their clients' decision-

---

[65] *See e.g.,* Ex. 6.

making through an illegal provision in the representation agreement that prohibit

clients from settling their claims without H&H's approval.

136. Specifically, since at least July 8, 2019, H&H's representation

agreement has prevented clients from:

> "obtain[ing] any settlement of the aforesaid claims
> without the complete approval of the Attorney."[66]

137. That provision clearly violates Rule 1.02(a)(2) of the Texas

Disciplinary Rules of Professional Conduct and renders the contract void as

against public policy. *See* Tex. Disciplinary R. Prof'l Cond. 1.02(a)(2) & cmt 5; *Davis*

*Law Firm*, 2014 WL 585855, at \*4 ("because the contingent fee agreement prohibited

settlement without [attorney's] consent, it was unenforceable as against public

policy"); *Plaza*, 363 B.R. at 521–22 ("Clauses in a contract between attorney and

client which prohibit a settlement by the client without his attorney's consent are

generally held to be unenforceable as against public policy"); *Sanes*, 25 S.W.3d at

805.

---

[66] Ex. 1 at 2 ¶c; Ex. 2 at 2 ¶c; Ex. 3 at 2 ¶c; Ex. 4 at 2 ¶c.

138. Since July 8, 2019, Defendants have entered into at least 4,290 representation agreements (and possibly as many as 6,435 or more)[67] with this unlawful provision.[68]

139. This attorney-first provision renders those agreements void as a matter of law.

## V.   Garza, Jones, and Morales sue in state court, but nonsuit and file in this Court when discovery reveals RICO violations.

140. Garza, Morales, and Jones initially filed suit, individually, in state court against Herrman and his Firm after they attempted to collect a full fee despite performing essentially no work. *See Morales & Garza v. Greg Herrman, Attorney at Law and Herrman & Herrman, PLLC*, No. 2020DCV-1662-H (Aug. 20 Original Petition, 347th Nueces County Dist. Ct.); *Jones v. Greg Herrman Attorney at Law and Herrman & Herrman*, 2021DCV-2168-C (94th District Court, Nueces County).

------------------------

[67] Based on Luna's testimony that Herrman & Herrman signs up 30 to 45 clients per week (Ex. 9 at 32), that is 1,560 to 2,340 clients per year. 2.75 years (July 2019–April 2020) x 1,560 = 4,290. 2.75 years x 2,340 = 6,435.

[68] If H&H collected an average of $1,000 in attorneys' fees among the 6,435 signed clients (with the recognition that there will be much greater recovery in some instances and no recovery in others), that is $6,435,000 in attorneys' fees collected under the void representation agreements.

141.   On January 10, 2021, Herrman supplemented discovery in Jones' case to reveal that actual administrative expenses in her case were $18.60,[69] having previously disclosed actual administrative expenses of $18.22 and $7.55 for Garza and Morales.[70]

142.   At this point it became clear that this was not just an isolated case of expenses exceeding a flat rate fee. Rather, there was a demonstrated pattern of fraud in the $195 "administrative fee" through interstate wires implicating RICO—*i.e.*, the "administrative fee" scheme.

143.   As such, Garza, Morales, and Jones nonsuited their cases in state court without prejudice and filed the instant class action complaint alleging RICO violations.

144.   Of note, before the nonsuit, the 347th district court granted a partial summary judgment in favor of Morales and Garza, finding that the provision

---

[69] Ex. 5 at 5–6 (supplemental answer to interrogatory 9).

[70] Ex. 6.

prohibiting settlement without H&H's consent violated the rules of ethics and

rendered the representation agreements voidable.[71]

## CLASS ACTION ALLEGATIONS

145. Plaintiffs and the Class incorporate by reference the foregoing

allegations as if fully set forth herein.

146. **Class Definition:** Plaintiffs bring this action pursuant to Federal Rule

of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of themselves and a class of

similarly situated persons, defined as follows:

> Any person who is a former client of Herrman & Herrman, PLLC who signed a representation agreement with Herrman & Herrman, PLLC on or after March 19, 2019, and settled a personal injury claim without filing a lawsuit and was charged a $195 or greater "administrative fee;" or any person who is a former client of Herrman & Herrman, PLLC who signed a representation agreement with Herrman & Herrman, PLLC on or after March 19, 2019, and subsequently faced efforts by Herrman & Herrman, PLLC to collect the $195 or greater "administrative fee" despite terminating Herrman & Herrman, PLLC's services; or any person who is a former client of Herrman & Herrman, PLLC who signed a representation agreement with the law firm Herrman & Herrman, PLLC on or after July 8, 2019, which included a provision prohibiting the client from settling a personal injury

---

[71] Ex. 19, First Amended Order Granting Plaintiffs' Traditional Motion for Partial Summary Judgment, Morales & Garza v. Greg Herrman, Attorney at Law and Herrman & Herrman, PLLC, No. 2020DCV-1662-H, (347th District Court, Nueces County, Tex. June 16, 2021).

claim without the complete approval of Herrman & Herrman, PLLC, and who settled a personal injury claim from which Herrman & Herrman, PLLC took attorney's fees.

147. **Numerosity**: The exact number of members of the Class is unknown and is currently not available to Plaintiffs, but individual joinder in this case is impracticable. The Class likely consists of at least one thousand members and perhaps several thousand members. Members of the Class can be easily identified through Defendants' records.

148. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to:

a.      Whether Count I RICO Defendants violated RICO §1962 (c);

b.      Whether Count II RICO Defendants (H&H and Herrman) violated RICO § 1962(a);

c.      Whether Count III RICO Defendants violated RICO §1962(d);

d.      Whether Defendants engaged in a pattern of racketeering activity connected to the establishment, conduct, or control of the enterprise;

e.      Whether Count I RICO Defendants committed multiple predicate acts of Wire Fraud;

f.      Whether Count I RICO Defendants' use of the $195 "administrative fee" provision; their efforts to collect the fee from clients and out-of-state insurers; and their deduction of the $195 fee from client settlements was a scheme to defraud or to obtain money or property by means of false pretenses;

g.      Whether Count III RICO Defendants made an agreement to commit the RICO offenses contained in Counts I and II of this Complaint.

h.      Whether the wrongful deduction of the $195 "administrative fee" from their settlements is an injury to H&H former clients' business or property;

i.      Whether Defendants Greg Herrman, Steven Stratso, Kyzmyck Byerly, and H&H breached their fiduciary duties to their former clients by, among other violations, charging them a profit margin on actual costs, and stripping them of their right to settle their claims without H&H approval;

j.      Whether the remedy for Defendants' conduct is disgorgement of all legal fees collected by H&H;

k.      Whether a declaratory judgment should be entered declaring H&H's representation agreement void as against public policy;

l.      Whether all Defendants committed common law fraud;

m.      Whether H&H's $195 "administrative fee" provision is a false material misrepresentation;

n.      Whether compensatory damages for the collection of the $195 "administrative fee" includes an amount representing the difference between the $195 fee and a client's actual administrative expenses;

o.      Whether all Defendants committed common law civil conspiracy; and

p.      Whether Defendants were unjustly enriched to the extent actual administrative expenses were less than the $195 "administrative fee," and were enriched by collection of a contingency fee premised upon a void contract.

149.   **Adequate Representation**: Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class. Proposed Class Counsel is competent and have experience in complex litigation and class actions. They are also experienced and have had successes in fighting abusive attorneys' fees and expenses.[72] Plaintiffs' claims are typical of the claims of the other members

---

[72] *See e.g., In re Optical Disk Drive Prods. Antitrust Litig.*, No. 10-md-02143-RS, 2021 WL 4124159, 2021 U.S. Dist. LEXIS 171405, at *23 (N.D. Cal. 2021) (finding that the Bandas Law Firm's attorneys benefitted a settlement class by $21.8 million,

of the Class. Plaintiff and members of the Class sustained damages as a result of

Defendants' uniform wrongful conduct. Plaintiffs have no interests antagonistic to

those of the Class, and Defendants have no defenses unique to Plaintiffs. Plaintiffs

are committed to vigorously prosecuting this action on behalf of the members of

the Class, and Proposed Class Counsel have the resources to do so. Plaintiffs do

not have any interest adverse to those of the other members of the Class.

150. **Superiority**: This case is also appropriate for class certification

because class proceedings are superior to all other available methods for the fair

and efficient adjudication of this controversy. Joinder of all parties is

impracticable, and the damages suffered by the individual members of the Class

will likely be relatively small, especially given the burden and expense of

individual prosecution of the complex litigation necessitated by Defendants'

actions. Thus, it would be virtually impossible for the individual members of the

Class to obtain effective relief from Defendants' misconduct. Even if members of

the Class could sustain such individual litigation, it would still not be preferable

to a class action, because individual litigation would increase the delay and

_____

reflecting the amount of improperly charged attorneys' fees by a nationwide
Plaintiff's law firm, Hagens Berman).

expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be fostered, and uniformity of decisions ensured.

151.   Plaintiffs reserve the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery. This is particularly important since H&H has refused to provide Plaintiffs' information from their files.[73]

---

[73] For example, H&H refused to provide information from Morales' and Jones' files, including actual administrative expenses, and required undersigned counsel to file multiple motions to compel in the state court litigation. H&H also refused to provide information to undersigned counsel for Garza relating to his expenses.

## CLAIMS FOR RELIEF

### COUNT I
### RICO 18 U.S.C. § 1962(c)

*As Against Defendants Greg Herrman, Steven Stratso, Kyzmyck Byerly, Rodney Glenn, and Hector Luna on Behalf of Plaintiffs and the Class*

152.  Plaintiffs and the Class incorporate by reference the foregoing allegations as if fully set forth herein.

153.  Plaintiffs, individually and on behalf of the proposed class, assert a civil RICO claim against Herrman, Stratso, Byerly, Glenn, and Luna under 18 U.S.C. § 1962(c). That "subsection states that a person who is employed by or associated with an enterprise cannot conduct the affairs of enterprise through a pattern of racketeering activity…." *Vanderbilt Mortg. & Fin., Inc. v. Flores*, 746 F. Supp. 2d 819, 840 (S.D. Tex. Oct. 20, 2010). This subsection "was intended to prevent the operation of a legitimate business or union through racketeering." *Id.* (citing David B. Smith & Terrance G. Reed, Civil RICO, ¶ 5.01, p. 5-2 (1997)).

154.  To prove a violation of this subsection, the plaintiff must show: "(1) a person who engages in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct, or control of the enterprise." *Id.* (quoting *Crowe v. Henry*, 43 F.3d 198, 203 (5th Cir. 1995); *In re Mastercard Int'l. Inc.*, 313 F.3d

257, 261 (5th Cir. 2002)). "A pattern of racketeering activity is created by two or more predicate acts that are related and constitute or pose a threat of continued criminal activity." *DHI Grp., Inc. v. Kent*, 397 F. Supp. 3d 904, 926 (S.D. Tex. Jul. 12, 2019) (citing 18 U.S.C. § 1961(5); *Brown v. Protective Life Ins. Co*., 353 F.3d 405, 407 (5th Cir. 2003)).

155.  Here, the RICO Enterprise is H&H. *See* 18 U.S.C. § 1961(4) (defining enterprise to "include[] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity").[74]

156.  For purposes of § 1962(c), Defendants Herrman, Stratso, Byerly, Glenn, and Luna are the RICO "persons" as defined by the statute. That is, Herrman, Stratso, Byerly, Glenn, and Luna are persons capable of holding legal or beneficial interests in property. 18 U.S.C. § 1961(3).

---

[74] For purposes of Plaintiffs' § 1962(c) claim, H&H is not a RICO person and Plaintiffs and the class have not named H&H as a defendant with respect to their § 1962(c) claims. By contrast, H&H is a RICO Person and defendant for purposes of Plaintiffs' § 1962(a) and (d) claims as described *infra*.

157.   There may be additional members of the RICO Enterprise who are not, as of now, named as defendants in this action. Plaintiffs reserve the right to amend their complaint upon discovery of the names of these members.

158.   Each of the Count I RICO Defendants named in this section under § 1962(c), *i.e.*, Herrman, Stratso, Byerly, Glenn, and Luna, is distinct from the RICO enterprise itself, H&H. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) ("The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status"); *Abraham v. Singh*, 480 F.3d 351, 357 (5th Cir. 2007) ("This allegation is sufficient to demonstrate that the RICO person, an individual employee of the corporation, is distinct from the RICO enterprise, the corporation itself); *see also Mugg v. Hutmacher*, 18-CV-732-RP, 2019 U.S. Dist. LEXIS 130669, at *13–14 (W.D. Tex. Jul. 10, 2019) (argument that defendant corporation committed predicate acts through its agents, and thus the RICO persons were not distinct from the enterprise was misplaced not where plaintiff did not allege "association in fact" but rather that the corporation itself was the RICO enterprise). Further, H&H is an entity, a personal-injury law firm, separate and apart from the pattern of racketeering—i.e., the fraudulent

"administrative fee" scheme accomplished by Wire Fraud (18 U.S.C. § 1343)—in which Herrman and his associates have and continue to engage.

159.   The Count I RICO Defendants are persons employed by or associated with H&H, the RICO Enterprise as alleged herein. Herrman is the managing partner of H&H; Stratso and Byerly are attorneys under Herrman's direction; Glenn and Luna are staff at the law firm under Herrman's direction. Herrman, Stratso, Byerly, Glenn, and Luna participated (and continue to participate) directly in the conduct of H&H's affairs through a pattern of racketeering activity, which in turn injured Plaintiffs in their business or property.

160.   The Count I RICO Defendants willfully and intentionally violated state and federal laws with the goal of obtaining money, directly and indirectly, through a pattern of racketeering activities composed of numerous indictable offenses, specifically multiple acts of Wire Fraud (18 U.S.C. § 1343).

161.   Plaintiffs and the proposed class members have standing because they sustained injury to their "business or property" by reason of Defendants' violations of §1962. *See* 18 U.S.C. § 1964 (allowing recovery by "[a]ny person injured in his business or property by reason of a violation of section 1962"). Specifically, Plaintiffs and the Class have been assessed a fraudulent and unlawful

$195 "administrative fee" taken from monies paid on their personal injury claims by reason of Defendants' violations of §1962. Collectively, the Class may have suffered more than $600,000 in damages from this cash grab. Additionally, Plaintiffs and some members of the Class had to incur expenses to fight H&H's collection efforts by reason of Defendants' violations of §1962. They would not have suffered these injuries but for Defendants' misconduct, and their injuries are proximately caused by and a direct result of the Defendants' wrongful acts—*i.e.*, the repeated commission of wire fraud through the assessment and collection of the fraudulent "administrative fee." *See Warnock v. State Farm Mut. Auto. Ins. Co.*, No. 5:08cv01-DCB-JMR, 2008 U.S. Dist. LEXIS 81507, at *17–18 (S.D. Miss. 2008) (finding plaintiff that alleged monetary injuries that would not exist but for the defendant's conduct "pled adequately that she suffered injury to her business or property by reason of the defendants' acts, … has standing to bring a civil RICO claim"); *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 936 (N.D. Cal. 2013) ("A consumer who has been overcharged can claim injury to property under RICO based on a wrongful deprivation of money, which is a form of property"); *Dufour v. BE LLC*, No. C 09–03770 CRB, 2010 WL 2560409, at *11 (N.D. Cal. June 22, 2010)

("Plaintiffs here allege that they were deprived of their money based upon Defendants' conduct, which is sufficient.").[75]

### The RICO Enterprise—Herrman & Herrman, PLLC ("H&H")

162.   The RICO Enterprise is H&H, which is a professional limited liability corporation that served as the vehicle for racketeering activities by Count I RICO Defendants Herrman, Stratso, Byerly, Glenn, Luna, and unnamed/unknown associates and employees of H&H. *See* 18 U.S.C. § 1961(3),(4) ("enterprise includes any … corporation, association, or other legal entity" and "person includes any individual or entity capable of holding a legal or beneficial interest in property").

163.   Each of the Count I RICO Defendants conducted and/or participated in the business and financial affairs of the RICO Enterprise through a pattern of

---

[75] "For RICO claims based on mail or wire fraud, plaintiffs do not have to plead reliance, first-hand or otherwise, to prove proximate cause." *Harris County v. Eli Lilly & Co.*, No. H-19-4994, 2020 U.S. Dist. LEXIS 179199, at *30 (S.D. Tex. 2020) (citing *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 647, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008)). "Using the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate act of racketeering under RICO, even if no one relied on any misrepresentation." *Bridge*, 553 U.S. at 647; *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009) ("The Supreme Court recently held that no reliance requirement exists for civil causes of action under RICO for victims of mail fraud.") (citing *Bridge*, 553 U.S. at 639); *see also Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 676 (5th Cir. 2015) ("In cases predicated on mail or wire fraud, reliance is not necessary.").

racketeering activity (*i.e.*, repeated and systematic wire fraud in violation of 18 U.S.C. § 1343), as described herein, that generated charges and payment of fraudulent and unlawful "administrative fees." For the past three years, this pattern of racketeering activity has impacted thousands of clients while generating exorbitant financial gain for Greg Herrman, and on information and belief, his associates and employees.

164.  Greg Herrman has final say over the actions of the RICO Enterprise, including the decision to charge clients the fraudulent "administrative fee," how much it will be, how to represent the charge to the clients, and the methods for collecting the "administrative fee."[76]

165.  Herrman shares the RICO Enterprise's ill-gotten profits with the Firm, attorneys, and employees.

166. While Herrman manages the RICO Enterprise, Stratso, Byerly and other attorneys help secure clients for the RICO Enterprise and sign the representation agreements that include the fraudulent "administrative fee."

––––––––––––––––––––

[76] *See* Ex. 10 at 5, Second Supplemental Response to Interrogatory 4 ("The $195 administrative flat fee was decided by Greg Herrman, manager of Herrman & Herrman, PLLC").

Further, when clients terminate H&H's representation, at Herrman's direction, Stratso, Byerly, and Glenn also threaten liens and legal action and refuse to turn over client files to ensure recovery of the fraudulent "administrative fee."

167.   As managing partner, Herrman has acted as the boss of the RICO Enterprise, providing leadership and overall command, and made the decisions to charge and set the amount for the fraudulent "administrative fee" to the clients.

168.   As a part of the RICO Enterprise, Count I RICO Defendants acted in concert to enrich themselves and further the common interests of the group as a whole. Their wrongful conduct remains part of the RICO Enterprise's ongoing way of doing business and constitutes a continuing threat to the Plaintiffs and the Class's property.

169. Without the repeated violative acts and intentional coordination between Count I RICO Defendants and other unnamed H&H attorneys and employees, the RICO Enterprise's scheme would not have succeeded and would not pose a threat to Plaintiffs and the Class into the future.

### RICO Person Greg Herrman

170. Throughout the operation of the RICO Enterprise, Herrman, as managing partner for H&H, has directed the RICO Enterprise and has taken primary responsibility for its activities.

171. Herrman provides the system of authority and directs the Enterprise's affairs on a continuing basis, by, for example, setting the amount of the fraudulent "administrative fee" to be charged the client and allocating payouts from the illicit profit.

172. H&H has admitted that "[t]he $195 administrative flat fee was decided by Greg Herrman, manager of Herrman & Herrman, PLLC."[77]

173. Herrman set the $195 "administrative fees" even though he knew that administrative expenses in prelitigation cases are almost always a small fraction of that amount.

174. Herrman organizes and conducts the affairs of the RICO Enterprise by, among other things, (1) deciding to impose the "administrative fee" and setting its value, (2) requiring that the $195 "administrative fee" for prelitigation clients

---

[77] Ex. 10 at 5, Second Supplemental Response to Interrogatory 4.

be included in all representation agreements, (3) ensuring that the representation agreements represent the $195 "administrative fee" as a reasonable charge for administrative expenses, going so far as to indicate the flat fee will save the prelitigation clients money despite the knowledge that administrative expenses for prelitigation clients are almost always a small fraction of that sum, (4) never informing the clients that the $195 "administrative fee" is mostly profit, and representing to the contrary that it is a cost-saving measure benefitting clients, and (5) arranging for his associates and employees to take efforts, including through the use of interstate wires, to ensure that they collected the fraudulent $195 "administrative fee."

175.  Herrman is not immune from liability for his racketeering activity directed at his clients simply because he is an attorney. To the contrary, that makes his conduct all the more egregious. His conduct and participation in the fraudulent scheme was not a petition for relief from a court, but rather a deliberate effort to defraud clients and collect profit from the "administrative fee," through wire fraud, when he knew the fee had no relation to actual administrative expenses. *Cf. In re Morrison*, Nos. 05-45926, 08-03260, 2009 Bankr. LEXIS 1795, at *9 (Bankr. S.D. Tex. 2009) ("*Noerr-Pennington* immunizes petitions to a public adjudicative body;

it [does not protect] fraudulent conduct that ultimately leads to the filing of a petition"); *Warnock v. State Farm Mut. Auto. Ins. Co.*, No. 5:08cv01, 2008 WL 4594129, at *7 (S.D. Miss. Oct. 14, 2008) (denying Rule 12(b)(6) motion to dismiss RICO claims against attorneys because, inter alia, the plaintiff alleged more than the mere filing of false litigation documents, and adequately pled a pattern of racketeering activity).[78]

### RICO Person Steven Stratso

176.   Stratso agreed to conduct the affairs of the RICO Enterprise by, for example, agreeing to (1) sign the representation agreement charging clients the $195 fraudulent "administrative fee" while knowing that the represented covered

---

[78] Further, since this suit is brought under federal question jurisdiction, the Texas "litigation privilege" is inapplicable. *See Ray v. Recovery Healthcare Corp.*, No. 3:19-CV-3055-G, 2021 U.S. Dist. LEXIS 53919, at *14-16 (N.D. Tex. 2021). Even if it were applicable, the privilege protects attorneys from civil actions based on "[c]ommunications made by any party during a judicial proceeding." *Shanks v. AlliedSignal, Inc.*, 169 F.3d 988,992 (5th Cir. 1999). Defendants' racketeering activities and fraudulent billing practices were not communications made during a judicial proceeding. Further, "[t]he litigation privilege is inapplicable if an attorney knowingly participates in the fraudulent activities outside the scope of his legal representation." *All. Dev., Inc. v. St. Paul Mercury Ins. Co.*, No. 4:11-CV-03234, 2012 U.S. Dist. LEXIS 3801, at *8-9 (S.D. Tex. 2012). There is simply no privilege that can or should extend to attorneys who have engaged in a pattern of racketeering conduct by fraudulently billing their clients.

expenses are almost always a small fraction of that amount, (2) sign the representation agreement portraying the $195 "administrative fee" as a cost-saving measure that benefits pre-litigation clients, (3) not explain to the clients that the $195 "administrative fee" is mostly profit, and (4) take efforts, including use of interstate wires, to ensure Defendants collected the "administrative fee."

177.   For example, Stratso signed an H&H representation agreement with Plaintiff Garza on July 8, 2019 that included the fraudulent "administrative fee."[79]

178.   The agreement represented that if the case settled without litigation, Garza would be charged an "administrative fee of $195 to cover expenses for the following: black and white photocopies, postage, long distance phone calls, scanned documents, facsimiles and other miscellaneous supplies."[80]

179.   Count I RICO Defendants, at the time of contracting, knew that expenses would only be a small fraction of this amount.

180.   Instead of advising him that the $195 "administrative fee" was mostly profit, the agreement represented it as a cost-saving measure for the client.[81]

---

[79] Ex. 1.

[80] *Id*. at 1.

[81] *Id.*

181.   Stratso had Garza sign the representation agreement without ever informing him that the $195 "administrative fee" was mostly profit for the attorneys.

182.   The list of covered costs was similarly deceptive and fraudulent. H&H did not incur any expenses of costs for long distance phone calls. Insofar as H&H did not have or ever would have actual long distance call expenses, it was misleading to inform Garza that the $195 "administrative fee" would cover those expenses.

183.   The contract also provided that the case could not be settled without H&H's approval.[82]

184.   The case settled on October 16, 2019 and Garza was charged the $195 fee even though the administrative expenses were likely a tiny fraction of this amount.[83]

185.   Stratso sent emails and letters to an out-of-state insurer to collect payment on Garza's claim, which included the $195 "administrative fee."

---

[82] Ex. 1 at 2 ¶c.

[83] Ex. 11. Herrman and H&H refused to turn over actual expenses incurred.

186.   Stratso later signed another H&H representation agreement with Garza in connection with a September 20, 2019 motor vehicle accident.[84]

187.   The agreement again represented that Garza would be charged the $195 "administrative fee," and portrayed it as a cost-saving measure.[85]

188.   The agreement also advised that Garza could not settle his claims without the approval of H&H.[86]

189.   Stratso never informed Garza that the $195 "administrative fee" was, in fact, mostly profit for the attorneys.

190.   On October 21, 2019, Stratso on behalf of H&H sent a fax to Garza's insurer Progressive Commercial in Island Heights, Ohio advising of H&H's claimed interest in Garza's claim.[87]

191.   Stratso threatened to file suit if the insurer did not acknowledge H&H's interest within five days.[88]

---

[84] Ex. 2.

[85] *Id.* at 1.

[86] *Id.* at 2 ¶c.

[87] Ex. 13.

[88] *Id.*

192.  On May 12, 2020, Stratso followed up with an email to Progressive employee Kymber D Fennell-Lewis in Oklahoma City, again demanding payment and specifically explaining "that our expenses are $198 per client[.]"[89]

193.  Stratso did so even though he and other H&H employees knew that administrative expenses were only $18.22.[90]

194.  Stratso's conduct and participation in the RICO Enterprise were not the provision of professional legal services. Instead, they embody an intentional effort to defraud and take money from clients through the "administrative fee," which he accomplished in part by use of interstate wires. *Cf. Morrison*, 2009 Bankr. LEXIS 1795, at *9; *Warnock*, 2008 WL 4594129, at *7.

### RICO Person Kyzmyck Byerly

195.  Byerly agreed to conduct the affairs of the RICO Enterprise by, for example, agreeing to (1) sign the representation agreement charging clients the $195 fraudulent "administrative fee" while knowing that the represented covered expenses are almost always a small fraction of that amount, (2) sign the

---

[89] Ex. 14.

[90] *See e.g.*, Ex. 6.

representation agreement portraying the $195 "administrative fee" as a cost-saving measure that benefits pre-litigation clients, (3) not explain to the clients that the $195 "administrative fee" is mostly profit, and (4) and take efforts, including use of interstate wires, to ensure Herrman and his associates collected the "administrative fee."

196. On November 11, 2019, Byerly signed an H&H representation agreement in connection with representation of client LaQuinta Jones for a pedestrian/motor vehicle accident that occurred on November 7, 2019.[91]

197. The agreement included the "administrative fee of $195 to cover expenses for the following: black and white photocopies, postage, long distance phone calls, scanned documents, facsimiles and other miscellaneous supplies."[92]

198. Count I RICO Defendants knew that these expenses almost always amount to a small fraction of the $195 fee.

199. The agreement represented the $195 "administrative fee" as a cost-saving measure for the client, rather than profit for the attorneys.[93]

---

[91] Ex. 3.

[92] *Id*. at 1.

[93] *Id*. at 1.

200.  Byerly never informed Jones that the $195 "administrative fee" was mostly profit for the attorneys.

201.  The contract also provided that the case could not be settled without H&H's approval.[94]

202.  Glenn, on information and belief, under the direction of Byerly, sent a fax to a State Farm Insurance claims representative in Phoenix, Arizona on December 9, 2019 advising of Herrman's intent to assert its full interest in attorney's fees and "office expenses of $195.00 in Laquinta Jones' claim." [95]

203.  Byerly and Glenn did so even though they and other H&H employees knew that the administrative expenses were only $18.60.[96]

204.  Moreover, Defendant Byerly's conduct and participation in the RICO Enterprise was not the provision of professional legal services. Her conduct and participation in the fraudulent scheme was not a petition for relief from a court, but rather a deliberate effort to defraud clients and collect profit from the "administrative fee," through wire fraud, with Count I RICO Defendants knowing

---

[94] *Id.* at 2 ¶c.

[95] Ex. 16.

[96] *See e.g.*, Ex. 5 at 5–6 (supplemental answer to interrogatory 9).

that the fee had no relation to actual administrative expenses. *Cf. Morrison*, 2009

Bankr. LEXIS 1795, at *9; *Warnock*, 2008 WL 4594129, at *7.

### RICO Person Rodney Glenn

205.  Glenn agreed to conduct the affairs of the RICO Enterprise by, for

example, having H&H clients sign representation agreements that portray the

$195 "administrative fee" as a cost-saving measure for the client without

informing them that it is mostly profit for Herrman and his associates and agreeing

to take efforts to collect the fraudulent "administrative expense" fee.

206.  Again, Glenn sent a fax to a State Farm Insurance claims

representative in Phoenix, Arizona on December 9, 2019 advising of Herrman's

intent to assert its full interest in attorney's fees and "office expenses of $195.00 in

Laquinta Jones' claim."[97]

207.  Byerly and Glenn did so even though they and other H&H employees

knew that  the administrative expenses were only $18.60.[98]

208.  Moreover, Defendant Glenn's conduct and participation in the RICO

Enterprise was not related to the provision of professional legal services as a

---

[97] Ex. 16, December 19, 2019 Glenn fax.

[98] *See e.g.*, Ex. 5 at 5–6 (supplemental answer to interrogatory 9).

paralegal or legal assistant. His conduct and participation in the fraudulent scheme was not a petition for relief from a court, but rather a deliberate effort to defraud H&H clients through misrepresentation, and through imposition and collection of an "administrative fee" by wire fraud that Count I RICO Defendants knew had no relation to actual administrative expenses. *Cf. Morrison*, 2009 Bankr. LEXIS 1795, at *9; *Warnock*, 2008 WL 4594129, at *7.

### RICO Person Hector Luna

209.  Luna agreed to conduct the affairs of the RICO Enterprise by, for example, having H&H clients sign representation agreements that portray the $195 "administrative fee" as a cost-saving measure for the client without informing them that it is mostly profit for Herrman and his associates and agreeing to take efforts to collect the fraudulent "administrative expense" fee.

210.  Moreover, Defendant Luna's conduct and participation in the RICO Enterprise was not related to the provision of professional legal services as a paralegal or legal assistant. His conduct and participation in the fraudulent scheme was not a petition for relief from a court, but rather a deliberate effort to defraud H&H clients through misrepresentation, and through imposition and collection of an "administrative fee" by wire fraud that Count I RICO Defendants

knew had no relation to actual administrative expenses. *Cf. Morrison*, 2009 Bankr. LEXIS 1795, at *9; *Warnock*, 2008 WL 4594129, at *7.

### Presently Unknown and/or Unnamed Members of the RICO Enterprise

211.  Does 1 through 100 are unknown to Plaintiffs at this time but may be necessary parties without whom the court cannot accord complete relief among existing parties. Plaintiffs reserve the right to amend their complaint upon discovery of the names of these members.

### Predicate Acts of Wire Fraud, 18 U.S.C. § 1343

212.  To state RICO predicate wire fraud violations under 18 U.S.C. § 1343, a plaintiff must establish: (1) a scheme or artifice to defraud or to obtain money or property by means of false pretenses, representations, or promises; (2) a use of the interstate wires for the purpose of executing the scheme; and (3) a specific intent to defraud either by revising, participating in, or abetting the scheme. *See Flores*, 746 F. Supp. 2d at 841.

213.  As described, Count I RICO Defendants and unnamed/unknown associates and employees of H&H engaged in a scheme to defraud and to obtain money by means of false or fraudulent representation—specifically that the $195

"administrative fee" was reasonable to cover administrative expenses and would benefit the client by saving them money.

214.   They never informed the clients that the administrative fee was in fact profit for themselves and/or H&H.

215.   They also did not disclose that they incur no expense for some of the items covered by the "administrative fee."

216.   At all times, it was reasonably foreseeable that interstate wires would be used to further these acts of artifice or deceit. Count I RICO Defendants and unnamed/unknown associates and employees of H&H knew that they would use interstate emails, faxes, and phone calls to communicate with out-of-state insurers to further their scheme and collect the unlawful and fraudulent "administrative fee." Further, H&H knew that any documents or emails generated in the case, including settlement demands and final settlement statements, would be transmitted to FileVine's out-of-state servers and data storage centers. And even a "'wire communication whose origin and ultimate destination are within a single state' can violate the wire fraud statue if it is 'routed through another state.'" *United States v. Halloran*, 821 F.3d 321, 342 (7th Cir. 2016) (quoting *Ideal Steel Supply*

*Corp. v. Anza*, 373 F.3d 251, 265 (2d Cir. 2004*), rev'd in part on other grounds*, 547 U.S.

451 (2006)); *see also United States v. Davila*, 592 F.2d 1261, 1264 (5th Cir. 1979).

217.   Defendants also have clients sign the representation agreement with

the $195 "administrative fee" using the AssureSign software, which transmits

client data and e-signatures across the internet and storage in servers located in

data zones around the world, including locations in the United States.

218.  The AssureSign process is interstate wire communication that

Defendants use to further their scheme to defraud their clients.

219.   The Count I RICO Defendants' specific acts of Wire Fraud involving

the named Plaintiffs include the following:  On October 21, 2019, Stratso faxed a

letter to Progressive Commercial in Island Heights, Ohio advising of H&H's

interest, which includes the fraudulent $195 "administrative fee," in Garza's claim

from his September 20, 2019 motor-vehicle accident.[99]

220.   Stratso's letter threatened suit if the insurer did not acknowledge

H&H's interest within five days.[100]

_____

[99] Ex. 13.

[100] *Id.*

221.  Stratso followed up on May 12, 2020 with an interstate email to Progressive employee Kymber D Fennell-Lewis in Oklahoma City, asking her to "forward to the handling adjuster that our expenses are $198 per client[.]"[101]

222.  Stratso made this representation so even though he and other H&H employees knew that the actual administrative expenses were just $18.22.[102]

223.  Later on May 12, 2020, Stratso sent an email to the handling adjuster Staci Snell in San Antonio, Texas, again discussing "our interest in this case."[103]

224.  With respect to Garza's prior accident that took place on July 6, 2019, an associate or employee of H&H communicated with an out-of-state insurer to collect payment, including the fraudulent $195 administrative fee.

225.  The out-of-state insurer paid the claim to H&H, including the $195 fraudulent "administrative fee."

226.  The Count I RICO Defendants took a similarly aggressive approach in attempting to collect money from Jones, including the fraudulent "administrative fee," from her November 7, 2019 automobile accident.

---

[101] Ex. 14.

[102] *See e.g.*, Ex. 6.

[103] Ex. 14.

227.  On December 9, 2019, H&H employee, Glenn, faxed State Farm Insurance claims representative in Phoenix, Arizona advising of H&H's full interest in attorney's fees and "office expenses of $195.00 in Laquinta Jones' claim." [104]

228.  Glenn did so even though he and other H&H employees knew that the administrative expenses were only $18.60.[105] Upon information and belief, Glenn did so at the direction of Herrman and/or an H&H associate.

229.  Stratso attempted to collect the "administrative fee" in relation to Morales' claim by sending a fax on H&H's behalf to Progressive Commercial in Island Heights, Ohio on October 21, 2019.[106]

230.  On May 12, 2020, Stratso followed up with an email to Progressive employee, Kymber D. Fennell-Lewis, in Oklahoma City, again demanding payment and specifically explaining "that our expenses are $198 per client[.]"[107]

---

[104] Ex. 16, December 19, 2019 Glenn fax.

[105] *See e.g.*, Ex. 5 at 5–6 (supplemental answer to interrogatory 9).

[106] Ex. 18.

[107] Ex. 14.

231.  Stratso did so even though he and other Defendants knew that the administrative expenses were only $7.55.[108]

232.  Thus, Count I RICO Defendants, through the RICO Enterprise, communicated with the out-of-state insurers involved in Garza's, Jones's, and Morales' cases via interstate Internet wires as part of their scheme to collect the unlawful and fraudulent $195 "administrative fee."

233.  The out-of-state insurer paid H&H for Garza's claim for the July 6, 2019 motor-vehicle accident, which included the $195 "administrative fee."

234.  The foregoing interstate wire demands for the fraudulent and unlawful administrative fees were made for the purpose of enriching H&H, Herrman, and his associates at the expense of their clients. Stratso, Byerly, and Glenn, and Luna, under the direction of Herrman, engaged in a pattern of wrongful conduct through numerous predicate acts of wire fraud.

235.  Numerous similar predicate acts of wire fraud were committed by these Defendants against their clients since early 2019, are ongoing, and will continue into the future.

_____

[108] Ex. 6.

236.   As a direct and proximate cause of the Count I RICO Defendants' plan and scheme, Count I RICO Defendants collected the unlawful $195 fraudulent "administrative fee" from funds belonging to Garza in connection with his July 6, 2019 accident.[109]

237.   As of the filing of this complaint, Count I RICO Defendants have not waived or abandoned their claims for the $195 "administrative fee" in connection with Jones' November 7, 2019 accident and still seek to collect it.

238.   Count I RICO Defendants have collected the unlawful $195 fraudulent administrative fees from funds belonging to thousands of clients since early 2019 and continuing through present. Absent judicial intervention, these Defendants will continue to collect the fraudulent $195 "administrative fee" from clients into the future.

239.   Defendants intended to profit from their scheme and obtain property belonging to Garza, Jones, Morales and the unnamed class members—specifically the $195 fraudulent "administrative fee" to be collected from funds paid for their personal-injury claims.

_____

[109] Ex. 11.

240. As described throughout this Complaint, Count I RICO Defendants each agreed to the commission of the Wire Fraud. For example:

a. Herrman orchestrated and directed the fraudulent and unlawful "Administrative Fee" wire fraud scheme, including representing the "administrative fee" as a benefit for clients when its purpose was to enrich the Firm, himself, and his associates at the expense of their clients. Herrman knew that he and the other Count I RICO Defendants would use interstate wires to accomplish their scheme, specifically by use of emails and faxes to insurers to collect the fraudulent "administrative fee."

b. Stratso agreed to carry out the fraudulent and unlawful "Administrative Fee" scheme by having clients sign contracts with fraudulent representations concerning the fee and signing the contract himself. Stratso knew that he and the other Count I RICO Defendants would use interstate wires to accomplish their scheme, specifically by use of emails and faxes to insurers to collect the fraudulent and unlawful "administrative fee."

c. Byerly agreed to carry out the fraudulent and unlawful "administrative fee" scheme by signing representation agreements with fraudulent representations concerning the fee.

      d.     Byerly knew that she and the other Count I RICO Defendants would use interstate wires to accomplish their scheme, specifically by use of emails and faxes to insurers to collect the fraudulent and unlawful "administrative fee."

      e.     Glenn agreed to carry out the fraudulent and unlawful "Administrative Fee" scheme by sending interstate faxes to insurers attempting to collect the fee.

      f.     Glenn knew that he and the other Count I RICO Defendants would use interstate wires to accomplish their scheme, specifically by use of emails and faxes to insurers to collect the fraudulent and unlawful "administrative fee."

      g.     The activity of the RICO Enterprise, H&H, affects interstate commerce. H&H regularly demands and receives payment from out-of-state insurers for personal injury claims. Likewise, the predicate acts of racketeering committed by Count I RICO Defendants (multiple acts of interstate wire fraud) are themselves acts of interstate commerce, and certainly affect interstate commerce.

      h.     The Count I RICO Defendants transacted business across state lines through the use of various instrumentalities of interstate commerce such as faxes, email, and phone calls to communicate in furtherance of the RICO Enterprise.

i.     H&H receives clients' settlement payments in form of negotiable instruments issued by out-of-state insurance carriers. Those negotiable instruments are typically drawn on out-of-state bank accounts of the insurers. H&H negotiates those negotiable instruments for the purpose of disbursing settlement proceeds to its clients and collecting its fee.

j.     H&H or its bank on its behalf received settlement payments for some of its clients via interstate wire transfers from out-of-state defendants and insurers.

k.     The receipt and negotiation of these instruments and the receipt of these wire transfers are interstate commerce and affect interstate commerce. Both further RICO Defendants' fraudulent administrative fee scheme.

l.     Additionally, H&H uses a case management software called FileVine, which is headquartered in Salt Lake City, Utah. All of Defendants' settlement demands sent via email were transmitted to FileVine's out-of-state servers and data storage centers.

241.  The racketeering acts described herein, and others, had the same pattern and similar purpose of taking money belonging to clients through the fraudulent representation and imposition of the "administrative fee." Each

racketeering act was related, had a similar purpose, involved the same or similar participants and methods of commission, and had similar results affecting Plaintiffs and members of the Class.

242. The racketeering acts, including multiple predicate acts of wire fraud of 18 U.S.C. § 1343 (Wire Fraud), also related to each other in that they were part of the RICO Persons' goal of reaping unlawful profits through Herrman and his associates' fraudulent scheme of charging "administrative fees" bearing no relation to actual administrative expenses.

243. Plaintiffs Garza, Jones, and Morales, as well as members of the Class, were deprived of money and property that they would not otherwise have lost. As a direct and proximate result of the racketeering activities of Herrman, Stratso, Byerly, Glenn, and Luna, Plaintiffs Garza, Jones, and Morales, and members of the Class have been injured in their business and property.

244. Plaintiffs Garza, Jones, Morales, and the Class are entitled to treble their damages, plus interest, costs, and reasonable attorneys' fees. 18 U.S.C. § 1964(c).

## COUNT II
## RICO §1962(a)

*As Against Greg Herrman and Herrman & Herrman, PLLC on Behalf of Plaintiffs and the Class*

245. Plaintiffs and the Class incorporate by reference the foregoing allegations as if fully set forth herein.

246. Subsection 1962(a) prohibits a person who has received income from a pattern of racketeering activity from investing that income in an enterprise. *North Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 202 (5th Cir. 2015). To state a claim under § 1962(a), plaintiff must plead "(1) the existence of an enterprise, (2) the defendant's derivation of income from a pattern of racketeering activity, and (3) the use of any part of that income in acquiring an interest in or operating the enterprise." *Id*. (citing *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 441 (5th Cir. 2000)). The Fifth Circuit has found no barrier to vicarious liability under § 1962(a) when the principal has derived some benefit from the agent's wrongful acts. *See Crowe v. Henry*, 43 F.3d 198, 206 (5th Cir. 1995);[110] a*ccord Haroco,*

---

[110] *See also* Practice Series, RICO, A Guide to Civil RICO Litigation in Federal Courts, §25 The Enterprise Under §§ 1962 (a),(b), and (d) ("Because § 1962(a) and § 1962(b) do not deal with the notion of conducting a separate enterprise, most courts have concluded that the person/enterprise distinction does not apply to

*Inc. v. Am. Nat'l Bank & Tr. Co.*, 747 F.2d 384, 401 (7th Cir. 1984) ("corporation-enterprise [will be] liable under RICO when the corporation is actually the direct or indirect beneficiary of the pattern of racketeering activity").

247.  As pleaded in the foregoing paragraphs, H&H is an enterprise engaged in and whose activities affect interstate commerce.

248.  In violation of 18 U.S.C. § 1962(a), Herman and H&H used and invested income that was derived from a pattern of racketeering activity, *i.e.*, collection of the fraudulent "administrative fee" through Wire Fraud (18 U.S.C. § 1343), for operation of an enterprise engaged in and whose activities affect interstate commerce.

249.  Specifically, Herman and H&H used and invested profit from the pattern of racketeering activity in administering the fraudulent "administrative

---

violations of those sections"); *Landry v. Air Line Pilots Ass'n Int'l*, 901 F.2d 404, 425 (5th Cir. 1990) ("ALPA can be both the enterprise and RICO defendant for the § 1962(b) violation. In contrast to the language of subsection (c) which "requires a *relationship* between the 'person' and the 'enterprise,' subsection[...] (b) requires only the *use* of an 'enterprise' by a 'person.'' Thus the RICO person and the enterprise need not be distinct for a person to be held liable under subsection (b)") (emphasis original).

fees" for the benefit and perpetuation of the racketeering enterprise, H&H, and the fraudulent "administrative fee" scheme.

250. The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

251. Further, as a direct and proximate result of Herman's and H&H's racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiffs have been injured in their business and property in that, on information and belief, collection of the fraudulent "administrative fee" through Wire Fraud that has been invested back into H&H and has funded successive racketeering acts, including imposition of the fraudulent $195 "administrative fee" against Plaintiffs. *See St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 443–444 (5th Cir. 2000) ("this Circuit's precedent dictates that a plaintiff 'need prove only that illegally derived funds flowed into the enterprise") (quotation omitted); 1 Civil RICO P 3.07 (2021) ("For showing a violation of § 1962(a), courts "readily find that the investment 'caused' plaintiff's injury if the money was invested in the same enterprise that was conducted through a pattern of racketeering activity, reasoning that the money enabled the business to keep operating and thereby keep perpetuating its fraudulent activities"); *see also Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385, 398 (6th Cir.

1989), *cert. denied*, 495 U.S. 508 (1990) (if defendant used income derived from racketeering activity to establish and operate the alleged scam in which the plaintiffs put their money, "we do not see why it would be impossible for the plaintiffs to show that they had been injured by a violation of § 1962(a)") (quotation omitted).

252.   Herrman and H&H benefit from this unlawful income derived from a pattern of racketeering activity.   Further, since H&H derived financial benefit from Herrman's investment of income received from a pattern of racketeering activity, H&H is vicariously liable for his acts under § 1962(a). *Crowe*, 43 F.3d at 206.

253.   Plaintiffs Garza, Jones, and Morales and the Class are entitled to treble damages, plus interest, costs, and reasonable attorneys' fees. 18 U.S.C. § 1964(c).

## COUNT III
## RICO § 1962(d)

*As Against Defendants Greg Herrman, Steven Stratso, Kyzmyck Byerly, Rodney Glenn, and Hector Luna on Behalf of Plaintiffs and the Class*

254. Plaintiffs and the Class incorporate by reference the foregoing allegations as if fully set forth herein.

255. 18 U.S.C. § 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Count III RICO Defendants agreed to and conspired to violate U.S.C. §1962(c).

256. Specifically, and as more fully described for each RICO person under Count I, the Count III RICO Defendants conspired to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity, *i.e.*, the assessment and collection of the fraudulent "administrative fee" through Wire Fraud. Under § 1962(d), the defendant need not operate or manage the enterprise; rather, "1962(d) applies to 'any person' who conspires to violate RICO." *United States v. Rosenthal*, 805 F.3d 523, 532 (5th Cir. 2015).

257. Herrman agreed to direct the RICO enterprise through a pattern of racketeering activity by, among other things: (1) making the decision to charge and set the amount of the fraudulent "administrative fees" billed to the client, and controlling the payouts to H&H employees; (2) representing the $195 "administrative fee" as a reasonable charge for administrative expenses despite the knowledge that the expenses are almost always a small fraction of that sum, (3) representing the $195 "administrative fee" as a cost-saving measure for the

client when it was actually profit for Herrman and his associates, (4) never informing the clients that the $195 "administrative fee" was actually profit, and (5) arranging for his associates and employees to take efforts to collect the fraudulent "administrative fee."

258. Stratso agreed to carry out the fraudulent and unlawful "administrative fee" scheme by signing client representation agreements with fraudulent representations concerning the fee and never informing the client that the "administrative fee" was actually profit, and by agreeing to take efforts to collect the fraudulent "administrative fee," including use of interstate wires to insurers to collect the fee.

259. Byerly agreed to carry out the fraudulent and unlawful "administrative fee" by signing client representation agreements with fraudulent representations concerning the fee and never informing the client that the "administrative fee" was actually profit, and by agreeing to take efforts to collect the fraudulent "administrative fee," including use of interstate wires to insurers to collect the fee.

260. Glenn agreed to carry out the fraudulent and unlawful "administrative fee" scheme by sending interstate faxes to insurers attempting to

collect the fee. Glenn knew that he and the other RICO persons would use interstate wires to accomplish their scheme, specifically by use of emails and faxes to insurers to collect the fraudulent and unlawful "administrative fee."

261.   Luna agreed to carry out the fraudulent and unlawful "administrative fee" by having clients sign the agreements with fraudulent representations concerning the fee and never informing them that the "administrative fee" was actually profit.

262.   Count III RICO Defendants intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The Count III RICO Defendants adopted the goal of furthering or facilitating the collection of the fraudulent "administrative fee" through Wire Fraud.

263.   As direct and proximate result of the Count III RICO Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property with Count III RICO Defendants having assessed the fraudulent $195 "administrative fee" from their personal injury settlements.

264.   Plaintiffs Garza, Jones, and Morales and the Class at large are entitled to treble damages, plus interest, costs, and reasonable attorneys' fees. 18 U.S.C. § 1964(c).

## COUNT IV
## Common Law Fraud

*As Against All Defendants on Behalf of Plaintiffs and on Behalf of the Class*

265.   Plaintiffs and the Class incorporate by reference the foregoing allegations as if fully set forth herein.

266.   Plaintiffs and the Class allege common-law fraud against all Defendants in connection with (1) the fraudulent "administrative fee" and (2) the provision giving H&H control of whether a client settles a claim.

267.   In Texas, the elements of common law fraud are: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury." *Allstate Ins. Co v. Receivable Fin. Co. LLC*, 501 F.3d 398, 406 (5th Cir. 2007) (citing *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001)).

268. As set forth above, all Defendants made material representations about the "administrative fee" in that they represented $195 as a reasonable fee to cover copies, postage, phone calls, scanned documents, faxes, and miscellaneous supplies.[111] While they represent the "administrative fee" as a money-saving measure for pre-litigation clients, since clients who file suit must pay "<u>all expenses</u>," they know that this representation is false because these expenses almost always amount to a small fraction of the $195 fee. The details of these material misrepresentations are set forth in more detail in Count I and the preceding sections, which are incorporated herein by reference.

269. Alternatively, all Defendants made these representations recklessly without any knowledge of the truth and as a positive assertion. Defendants represented the $195 fee as a benefit and not as including profit so that the Plaintiffs and class members would sign the representation agreement, which included the fee.

---

[111] Ex. 1 at 1; Ex. 2 at 2; Ex. 3 at 3; Ex. 4 at 4.

270.   Plaintiffs and class members signed the representation agreements in reliance on this false representation and suffered injury in the form of the unlawful $195 "administrative fee" taken from their settlement proceeds.

271.   Additionally, Defendants made material representations about the validity of the H&H representation agreement, which precludes clients from settling claims with "the complete approval" of H&H.[112]

272.   While Defendants represent this as a valid provision in the agreement, they know that it is not or alternatively made it recklessly without any knowledge of the truth and as a positive assertion.

273.   Defendants made this representation so that Plaintiffs and the Class would sign the representation agreements. Plaintiffs and class members signed the representation agreements in reliance on this false representation and suffered injury in the form of the loss of control over their ability to settle and Defendants' collection of unlawful attorneys' fees from their settlements. *See* Tex. Disciplinary R. Prof'l Cond. 1.02(a)(2) & cmt 5 ("the client may not be asked … to surrender …

---

[112] Ex. 1 at 2 ¶c; Ex. 2 at 2 ¶c; Ex. 3 at 2 ¶c; Ex. 4 at 2 ¶c.

the right to settle"); *Lopez*, 2016 WL 8924108, at *3; *Davis Law Firm*, 2014 WL 585855, at *4; *Plaza*, 363 B.R. at 521–22; *Sanes*, 25 S.W.3d at 805.

274. Defendants' representations to Plaintiffs were material because they were intended to induce Plaintiffs and the class to retain their legal services.

275. The foregoing misrepresentations were made willfully and with knowledge of their falsity when made.

276. Plaintiffs Garza, Jones, and Morales and the Class are entitled to actual damages and exemplary damages. Tex. Civ. Prac. & Rem. Code § 41.003(a).

**COUNT V**
**Breach of Fiduciary Duty**

*As Against Defendants Greg Herrman, Steven Stratso, Kyzmyck Byerly, and Herrman & Herrman on Behalf of Plaintiffs and the Class*

277. Plaintiffs and the Class incorporate by reference the foregoing allegations as if fully set forth herein.

278. This Count is alleged against Herrman, Stratso, Byerly, and H&H. In Texas, the elements of breach of fiduciary duty are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his or her fiduciary duty to the plaintiff; and (3) the defendant's breach must result in either injury to the plaintiff or benefit to the defendant. *See Navigant Consulting,*

*Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied)); *R.P. Small Corp. v. Land Dep't, Inc*., 505 F. Supp. 3d 681, 693-94 (S.D. Tex. Dec. 7, 2020).

279. As a matter of law, the Count V Defendants had fiduciary relationships with Plaintiffs and the Class, who are all former clients of Count V Defendants. "The relationship existing between attorney and client is characterized as highly fiduciary, and requires proof of perfect fairness' on the part of the attorney." *Sealed Party v. Sealed Party*, No. H-04-2229, 2006 U.S. Dist. LEXIS 28392, at *22-23 (S.D. Tex. Apr. 28, 2006) (quoting *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 22 (Tex. App.-Tyler 2000, pet. denied) (quoting *Archer v. Griffith*, 390 S.W.2d 735, 739, 8 Tex. Sup. Ct. J. 87 (Tex. 1964)). This relationship is described "as one of *uberrima fides*, which means, 'most abundant good faith,' requiring absolute and perfect candor, openness and honesty, and the absence of any concealment or deception." *Id*. at 23 (quoting *Hefner v. State*, 735 S.W.2d 608, 624 (Tex. App.-Dallas 1987, writ ref'd) (citing *State v. Baker*, 539 S.W.2d 367, 374 (Tex. Civ. App.-Austin 1976, writ ref'd n.r.e.)).

280. The Count V Defendants breached their fiduciary duties to Plaintiffs and the Class through the deceptive and fraudulent "administrative fee," which

they misrepresented as a benefit to the client rather than what it is—profit for the firm. *See* Texas Ethics Opinion 594 (attorney cannot profit on expenses without "the client underst[anding] and accept[ing] that the amounts billed by the lawyer for expenses would include this additional compensation"); *see also* A.B.A. Op. 93-379; *see also* Tex. Disc. R. Prof'l Cond. 1.04, 8.04; *cf. Anglo-Dutch Petroleum*, 352 S.W.3d at 450 (part of lawyer's fiduciary duty to a client "is to inform the client of all material facts"); *Levine*, 40 S.W.3d at 96 ("one facet of a lawyer's duty to the client … [is] to inform a client of the basis or rate of the fee at the outset of the matter" and the attorney has to obligation to clarify agreements since the attorney has "greater knowledge and experience with respect to fee arrangements and because the trust [the] client has placed in [the attorney]") (quotation omitted); see also Floyd v. Hefner, 556 F. Supp. 2d 617, 661 (S.D. Tex. 2008) ("[e]xamples of breaches of an attorney's fiduciary duty include benefitting improperly from the attorney-client relationship by subordinating the client's interests to the attorney's, retaining the client's funds, engaging in self-dealing, improperly using the client's confidences, failing to disclose conflicts of interest, and making misrepresentations to obtain these results").

281.   They further breached their fiduciary duty to the Class by failing to tell their clients that some of the so-called expenses covered under the "administrative fee" are not expenses at all. For example, upon information and belief, H&H pays no expense for long-distance phone calls. Yet, Defendants represent long-distance phone calls as part of the package of benefits covered under the $195 "administrative fee." The details of these misrepresentations are set forth in Count I and preceding sections and are incorporated into this Count by reference.

282.   The Count V Defendants also breached their fiduciary duties to Plaintiffs and the Class since at least July 2019 and continuing through present by contracting for complete control over their clients' right to settle their personal-injury claims.

283.   The Count V Defendants included this provision in all representation agreements even though it was clear that it violates Texas law and rendered the agreements void. *See* Tex. Disciplinary R. Prof'l Cond. 1.02(a)(2) & cmt 5; *Plaza*, 363 B.R. at 521 ("A clause in a retainer agreement prohibiting the client from settling without the attorney's consent is void as against public policy") (quoting ABA Comm. On Ethics and Prof'l Responsibility, Formal Op. 326 (1970) (quoting Henry

S. Drinker, Legal Ethics, 101 (Columbia Univ. Press 1953)); *Lewis*, 534 F.2d at 1122; *accord Giles v. Russell*, 222 Kan. 629, 567 P.2d 845, 850 (1977) ("employment contract which prevents the client from settling without the consent of the attorney is void as against public policy").

284.   Indeed, a state district court judge already found (before the claims were nonsuited without prejudice) that this specific provision violates Texas Disciplinary Rule of Professional Conduct 1.02(a) and renders the agreements void.[113]

285.   This provision demonstrates further intent by Count V Defendants to place their financial interests ahead of their clients. In addition to their self-dealing with the fraudulent "administrative fee," they contracted for the right to reject settlements if they don't like their fees—even when the client wants to settle. *See Plaza*, 363 B.R. 517 at 521-22 ("giving an attorney decision making power over whether to settle a case or proceed to trial, could force a litigant to hazard the outcome of litigation in order to secure a higher contingency fee for the attorney"). As with an attorney who enters into an aggregate settlement without the consent

---

[113] Ex. 19.

of clients, this is a clear and serious breach of fiduciary duty because it "may result in a benefit to the attorney … to the detriment of the clients[.]" *In re Rosenthal & Watson, P.C.*, 612 B.R. 507, 555 (Bankr. W.D. Tex. 2020).

286.   The Texas Supreme Court holds that a client need not show causation or actual damages to obtain forfeiture of an attorney's fee for the attorney's breach of fiduciary duty to the client. *Burrows v. Arce*, 997 S.W.2d 229, 240–42 (Tex. 1999) ("An agent's breach of fiduciary duty should not be deterred even when the principal is not damaged"); *In re Allied Physicians Grp., P.A.*, Nos. 397-31267-BJH-11, 3:04-CV-0765-G, 2004 U.S. Dist. LEXIS 25389, at *14 (N.D. Tex. 2004) ("Under Texas law, once a breach of fiduciary duty is found, a party is not required to prove injury or causation where the remedy is partial or total forfeiture").

287.   Further, if the fiduciary "takes any gift, gratuity, or benefit in violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for *all* he has received." *Burrow*, 997 S.W.2d at 239 (citing *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 514 (Tex. 1942)). That is, "*all* compensation received by a disloyal fiduciary is forfeited." *Allied Physicians*, 2004 U.S. Dist. LEXIS 25389, at *14 (emphasis added).

288.   Here, based on Count V Defendants' multiple clear and serious breaches of fiduciary duty, all fees collected by Count V Defendants from Plaintiff Garza and the proposed class should be forfeited and placed in constructive trust for Plaintiffs and the proposed class. *See Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs.*, 787 F.3d 716, 728 (5th Cir. 2015) ("Equitable remedies, such as . . . the imposition of a constructive trust, may be awarded for breach of the higher standards of conduct demanded in the fiduciary relationship.").

289.   Based on an estimated 6,435 clients signed by Herrman since July 8, 2019,[114] and a conservative estimate of $1,000 in attorneys' fees recovered on average (with some cases involving much more and others none at all), Plaintiffs and the Class seek a disgorgement of at least $6,435,000 in attorneys' fees.

## COUNT VI
## Declaratory Judgment

*As Against All Defendants on Behalf of Plaintiffs and on Behalf of the Class*

290.   Plaintiffs and the Class incorporate by reference the foregoing allegations as if fully set forth herein.

---

[114] *See supra* n. 67.

291. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, Plaintiffs and the Class petition this Court for a judgment declaring H&H's representation agreements with the Plaintiff and the Class Members void as against public policy. *See* Tex. Disciplinary R. Prof'l Cond. 1.02(a)(2) & cmt 5; *Davis Law Firm*, 2014 WL 585855, at *4; *Plaza*, 363 B.R. at 521–22; *Sanes*, 25 S.W.3d at 805.

292. As described in the foregoing paragraphs, H&H's representation agreements prohibit clients from settling claims without the firm's "complete approval."[115] Since at least July 8, 2019, the agreements have prevented clients from "obtain[ing] any settlement of the aforesaid claims without the complete approval of the Attorney."[116]

293. With respect to the Plaintiffs, H&H entered into a written agreement with Plaintiff Garza on July 8, 2019 that contained the provision giving the firm control over whether Garza settled his claims.[117]

---

[115] Ex. 1 at 2 ¶c; Ex. 2 at 2 ¶c; Ex. 3 at 2 ¶c; Ex. 4 at 2 ¶c.

[116] *Id*.

[117] Ex. 1 at 2 ¶c.

294.  H&H entered into a written agreement with Plaintiff Garza on September 20, 2019 with the same restriction on settling his claims.[118]

295.  H&H entered into a written agreement with Plaintiff Jones on November 11, 2019 that contained the same restriction on settling her claims.[119]

296.  H&H entered into a written agreement with Plaintiff Morales on September 20, 2019 that contained the same restriction on settling her claims.[120]

297.  Since July 8, 2019, Defendants have likely entered into at least 4,290 representation agreements (and possibly as many as 6,435 or more) with this unlawful provision.[121]

298.  An actual controversy has arisen and now exists between Plaintiffs and the Class and H&H regarding the validity of the representation agreements and the Firm's entitlement to fees thereunder. H&H has improperly collected or attempted to collect attorneys' fees from the Plaintiffs and the Class under representation agreements that are void as a matter of law.

---

[118] Ex. 2 at 2 ¶c.

[119] Ex. 3 at 2 ¶c.

[120] Ex. 4 at 2 ¶c.

[121] *See supra* n. 67.

299.   Specifically, H&H collected $6,475 in attorneys' fees against Plaintiff Garza under the July 8, 2019 representation agreement containing this unlawful provision.[122]

300.   H&H attempted to collect fees against Plaintiff Garza under the September 20, 2019 agreement (involving a different motor vehicle accident) containing this unlawful provision.

301.   H&H also attempted to collect fees against Plaintiff Jones under the November 7, 2019 agreement containing this unlawful provision.

302.   H&H also attempted to collect fees against Plaintiff Morales under the September 20, 2019 agreement containing this unlawful provision.

303.   Garza, Jones, and Morales filed suit against Greg Herrman and H&H in state court after the firm attempted to collect attorneys' fees despite this unlawful provision and the Firm performing essentially no work. *See Morales and Garza v. Greg Herrman*, Attorney at Law and Herrman & Herrman, PLLC, No. 2020DCV-1662-H (Aug. 20 Original Petition, 347th Nueces County Dist. Ct., Texas); *Jones v. Greg Herrman Attorney at Law and Herrman & Herrman*, 2021DCV-

---

[122] Ex. 11.

2168-C (94th District Court, Nueces County, Texas). As noted, Garza, Jones, and Morales nonsuited their claims upon discovery of facts giving rise to RICO claims. Before the nonsuit, however, the 347th district court granted a partial summary judgment in favor of Garza and another client, finding that the provision rendered the representation agreements voidable.[123]

304.   A judicial declaration is necessary and appropriate at this time under all the circumstances so that Plaintiffs and the Class may determine their rights and duties under the contract—specifically whether H&H is entitled to fees collected under representation agreements containing this unlawful provision that renders the agreements void as a matter of public policy. *See Davis Law Firm*, 2014 WL 585855, at *4 ("because the contingent fee agreement prohibited settlement without [attorney's] consent, it was unenforceable as against public policy."); *Plaza*, 363 B.R. at 521–22 ("Clauses in a contract between attorney and client which prohibit a settlement by the client without his attorney's consent are generally held to be unenforceable as against public policy."); *compare Sanes*, 25 S.W.3d 800

---

[123] Ex. 19.

(contractual provision allowing attorney authority to settle without consultation with client rendered entire contract voidable).

305.   Although the resolution of the declaratory action claim is primarily a question of Texas contract law, Plaintiffs' RICO claims would not resolve the issue at the heart of the declaratory judgment claim, accordingly it is "appropriate to exercise jurisdiction over Plaintiff's declaratory judgment claim." *Shea v. Best Buy Homes*, No. 1:20-CV-02387-SCJ, 2021 U.S. Dist. LEXIS 137995, at \*31-33 (N.D. Ga. 2021).

306.   Plaintiffs and the Class therefore seek a judicial determination that the provision in H&H's representation agreements that gives the Firm "complete" control over settlement renders the representation agreements void as against public policy. Plaintiffs and the Class additionally seek a declaration that H&H is not entitled to attorneys' fees sought or collected under these representation agreements. Alternatively, Plaintiffs and the Class seek a declaration that H&H are only entitled to reasonable fees for work actually performed on behalf of Plaintiffs and the Class that can be proven.

## COUNT VII
## Common-law Civil Conspiracy

*As Against All Defendants on Behalf of Plaintiffs and on Behalf of the Class*

307.   Plaintiffs and the Class incorporate by reference the foregoing allegations as if fully set forth herein.

308.   This Count is alleged against all Defendants.

309.   Plaintiffs and the Class allege civil conspiracy against all Defendants in connection with (1) fraud in representing, charging, and collecting the "administrative fee" and (2) breaching their fiduciary duty to their clients in retaining complete control over whether they settle their claims.

310.   The elements of civil conspiracy in Texas are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *United Biologics, L.L.C. v. Allergy & Asthma Network*, 819 F. App'x 204, 208 (5th Cir. 2020) (citing *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)).

311.   Here, Defendants agreed to collect profit from their clients through administrative expenses by not only representing that the $195 "administrative fee" was reasonable without disclosing that it was mostly profit, but also in representing that the clients would benefit from the flat fee charge. The Defendants

had a meeting of the mind on the object of the conspiracy, unlawfully collecting

fraudulent expenses, and on the course of action—misrepresenting the nature of

the fraudulent "administrative fees" and then taking measures to collect them.

These misrepresentations concerning the fees and the efforts taken by Defendants

to collect them are unlawful, overt acts. Plaintiffs and the Class suffered damages

as a proximate result—paying the unlawful $195 fraudulent "administrative fees"

from their settlement funds. It was reasonably foreseeable, and in fact deliberately

orchestrated, that Plaintiffs and the Class would pay the fraudulent $195

"administrative fees" when Defendants knew that actual expenses were only a

fraction of that amount.

312.  Defendants also committed civil conspiracy to breach their fiduciary

duty to Plaintiffs and the Class by agreeing to have them sign H&H representation

agreements in which the Firm retained exclusive control over whether the clients

settled their claims. Defendants took one or more unlawful acts, including this

provision in the representation agreements and having the clients sign the

agreements, and Plaintiffs and the Class were damaged as the proximate result.

Specifically, Plaintiffs and the Class suffered injury in the form of the loss of

control over their ability to settle and Defendants' collection of unlawful attorneys' fees from their settlements. *See supra.*

313.  Plaintiffs Garza, Jones, and Morales and the Class at large are entitled to actual damages and exemplary damages. Tex. Civ. Prac. & Rem. Code § 41.003(a).

## COUNT VIII
## Unjust Enrichment

*As Against All Defendants on Behalf of Plaintiffs and on Behalf of the Class*

314.  Plaintiffs and the Class incorporate by reference the foregoing allegations as if fully set forth herein.

315.  This Count is alleged against all Defendants.

316.  As an alternative claim for relief, Plaintiffs and the Class allege all Defendants were unjustly enriched through the representing, charging, and collecting the "administrative fee".

317.  In Texas, unjust enrichment is an equitable doctrine that allows recovery in quasi-contract or restitution if a contemplated agreement is "unenforceable, impossible, not fully performed, thwarted by mutual mistake, or void for other legal reasons." *French v. Moore*, 169 S.W.3d 1, 11 (Tex. App.— Houston [1st Dist.] 2004, no pet.).  It is typically found to apply where one person

has obtained a benefit from another by fraud, duress, or the taking of an undue advantage. *Burlington N. R. Co. v. S.W. Elec. Power Co.*, 925 S.W.2d 92, 97 (Tex. App.—Texarkana 1996), *aff'd sub nom S.W. Elec. Power Co. v. Burlington N. R. Co.*, 966 S.W.2d 467 (Tex. 1998).

318. Defendants collected profit from their clients through administrative expenses by representing that the $195 "administrative fee" was reasonable without disclosing that it was mostly profit, and representing that the clients would benefit from the flat fee charge. The Defendants represented to Plaintiffs and the Class that they would receive the benefit of a bargain whereby Defendants incurred and paid for certain expenses (*e.g.*, faxes, copies, scans, long distance phone calls, etc.) and Plaintiffs and the Class would be charged a flat rate of $195 regardless of the actual expenses in those categories.  In fact, actual expenses incurred in those categories were routinely far lower than the $195 charged by Defendants, resulting in a windfall to Defendants. Defendants' failure to advise Plaintiffs and the Class of the true profit-motive behind the "administrative fee" was a fraud and misrepresentation and took advantage of the Plaintiffs' and class's lack of knowledge concerning the likely actual expenses known to Defendants. It would be unjust and inequitable to allow Defendants to retain ill-gotten profits

based on their failure to advise Plaintiffs and the Class of the profit sought and collected by Defendants in the form of this "administrative fee".

319.   Defendants were also unjustly enriched by the collection of contingency fees that were premised on a void and unethical attorney representation agreement.  Specifically, Defendants had Plaintiffs and the Class sign H&H representation agreements in which the firm retained exclusive control over whether the clients could settle their claims. Such a provision wrongfully denied Plaintiffs and the Class of the right to control their case and rendered the entire contract, including any contingency fees premised thereon, void.  Plaintiffs and the class suffered injury in the form of the loss of control over their ability to settle and Defendants' collection of unlawful attorneys' fees from their settlements. *See supra*.

320.  Plaintiff Garza and the Class are entitled to actual damages in the amount of $195 for the fraudulent "administrative fee" that was collected by Defendants from Plaintiffs' settlements. Plaintiff Garza and the Class are further entitled to actual damages in the amount of contingency fees

collected by Defendants that were premised upon the void contracts drafted

and prepared by Defendants.

## DISCOVERY RULE AND FRAUDULENT CONCEALMENT

*Texas' Discovery Rule Applies to Plaintiffs' and Class Members' State Law and Declaratory Judgment Claims*

321.  Plaintiffs and the Class incorporate by reference the foregoing allegations as if fully set forth herein.

322.  Plaintiffs, on behalf of themselves and all putative class members, affirmatively plead the discovery rule with regard to any statute of limitations affirmative defense pleaded or otherwise argued by any Defendant. *See S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996) ("Strictly speaking, the cases in which we have deferred accrual of causes of action for limitations purposes fall into two categories: those involving fraud and fraudulent concealment, and all others. The deferral of accrual in the latter cases is properly referred to as the discovery rule.").

323.  "Restated, the general principle is this: accrual of a cause of action is deferred in cases of fraud or in which the wrongdoing is fraudulently concealed and in discovery rule cases in which the alleged wrongful act and resulting injury were inherently undiscoverable at the time they occurred but may be objectively verified." *Id*. at 6.

324.   In addition to its application to Plaintiffs' state law claims, the discovery rule is applicable to declaratory judgments sought in federal court. *See, e.g., Delhomme v. Caremark Rx, Inc.*, No. 3:05-CV-505-R, 2006 U.S. Dist. LEXIS 46037, at *8-*15 (N.D. Tex. Jul. 7, 2006) (analyzing Texas state law regarding the discovery rule and fraudulent concealment for purposes of deciding summary judgment motion against declaratory judgment claim).

325.   Plaintiffs' injuries were inherently undiscoverable, as a matter of law, because of the attorney-client and fiduciary relationship between Plaintiffs and their lawyers. *See Willis v. Maverick*, 760 S.W.2d 642, 644 (Tex. 1988) ("[t]he special relationship between an attorney and client further justifies imposition of the discovery rule"); *see also Simmons v. Simmons*, No. 03-15-00008-CV, 2016 Tex. App. LEXIS 353, at *8 (Tex. App.—Austin 2016, no pet.) ("The Texas Supreme Court has held that there is a presumption that a fiduciary's misconduct is inherently undiscoverable, the rationale being that a person owed a fiduciary duty is 'either unable to inquire into the fiduciary's actions or unaware of the need to do so'") (citing *S.V.*, 933 S.W.2d at 8).

326.   Plaintiffs' injuries and injuries of the Class were also inherently undiscoverable because they were "by nature unlikely to be discovered within the

prescribed limitations period despite due diligence." *S.V.*, 933 S.W.2d at 7. "Even apart from such a relationship, we have indicated that the discovery rule applies when it is otherwise difficult to learn of the wrongful act." *Id.* at 6.

327.    Defendants' scheme made it virtually impossible to learn of their wrongful acts. They misrepresented the $195 "administrative fee" as a cost-savings. They never provided an itemized statement of administrative costs to their clients. Plaintiffs and the Class would never have reason to know that their actual costs were far less than the $195 "administrative fee" charged by Defendants.

328.    Similarly, as non-lawyers, Plaintiffs and the Class had no reason to know that the surrender of their rights to settle their claims without H&H approval was fraudulent and a breach of fiduciary duty.

329.    Plaintiffs' injuries—and those of putative class members—may be objectively verified. *See S.V.*, 933 S.W.2d at 15 ("[t]o invoke the discovery rule, a plaintiff's claim must be 'inherently undiscoverable' and 'objectively verifiable[,]'" which can be proven by "direct, physical evidence"). They can be proven by direct, physical evidence. Defendants overcharged Plaintiffs and the Class for administrative costs. The $195 "administrative fee" was not a cost-savings because

the clients actual administrative costs were far below the $195 "administrative fee."

330.   The H&H representation agreement itself is such evidence. H&H's records regarding receipt of the $195 "administrative fee" is direct evidence. H&H client account statements, which do not itemize administrative costs, are also direct evidence. Settlement distributions to H&H which deduct the $195 "administrative fee" are also direct evidence.

331.   Similarly, it is indisputable that H&H stripped their clients of the authority to settle their claims in the representation agreement. And that may also be proved by direct evidence.

*The "Injury Discovery Rule" Applies to Plaintiffs' and Class Members' RICO Claims.*

332.   "This Circuit has adopted an 'injury discovery rule,' whereby a civil RICO claim accrues when the plaintiff discovers, or should have discovered the injury." *Joseph v. Bach & Wasserman, LLC*, 487 Fed. App'x 173, 176 (5th Cir. 2012) ("It is discovery of the injury, and not other elements of a RICO claim, that starts the limitations period running.") (citing *Rotella v. Wood*, 528 U.S. 549, 556 (2000)).

333.   Neither Plaintiffs nor class members discovered or should have discovered their injuries before the date that would otherwise put their RICO claims outside its four-year statute of limitations.

*Defendants' Fraud and Fraudulent Concealment Delayed the Accrual of and/or Tolled the Statute of Limitations for Plaintiffs' and Class Members' RICO, State Law, and Declaratory Judgment Claims.*

334.   Plaintiffs, on behalf of themselves and all putative class members, affirmatively plead Defendants' fraud and fraudulent concealment with regard to any statute of limitations affirmative defense pleaded or otherwise argued by any Defendant. *See C.V.*, 933 S.W.2d at *6 ("Fraud, we have said, in and of itself prevents running of the statute of limitations."); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194 (1997) ("We limit our consideration of the question to the context of civil RICO. In that context, we conclude that 'reasonable diligence' does matter, and a plaintiff who is not reasonably diligent may not assert 'fraudulent concealment.'").

335.   In addition to their application to Plaintiffs' state law and RICO claims, fraud and fraudulent concealment may act to toll the statute of limitations for declaratory judgments sought in federal court. *See, e.g., Delhomme*, 2006 U.S. Dist. LEXIS 46037, at *8-*15 (analyzing Texas state law regarding the discovery

rule and fraudulent concealment for purposes of deciding summary judgment motion against declaratory judgment claim).

336.   Defendants fraudulently concealed the actual costs charged to their clients by producing final account statements that do not contain an itemized breakdown of expenses actually incurred.

337.   Defendants represented the $195 "administrative fee" as a cost-savings, creating the false belief in their clients that the $195 "administrative fee" was reasonable and in fact would be preferrable to having to pay actual expenses like clients who have to file suit.

338.   Defendants did not disclose to Plaintiffs or the Class that they do not actually incur costs for some of the services included within the $195 "administrative fee."

339.   Defendants never disclosed to Plaintiffs or the Class that most of the $195 "administrative fee" was profit.

340.   Defendants made material representations about the validity of the H&H representation agreement, which precludes clients from settling claims with "the complete approval" of H&H.[124]

341.   While Defendants represent this as a valid provision in the agreement, they know that it is not or alternatively made it recklessly without any knowledge of the truth and as a positive assertion.

342.   At all times, Plaintiffs—and putative class members—exercised reasonable diligence.

343.   As such, the four-year statute of limitations for RICO claims was either tolled or Defendants are estopped from asserting the statute of limitations as an affirmative defense.

**PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs and the proposed Class pray for the following relief:

a.   Certification of this case as a class action on behalf of the Class defined above, appointing Arturo Garza, Laquinta Jones, and Doris Morales as

---

[124] Ex. 1 at 2 ¶c; Ex. 2 at 2 ¶c; Ex. 3 at 2 ¶c; Ex. 4 at 2 ¶c.

representatives of the Class and appointing the undersigned, , Mikell A. West, and Robert W. Clore, Bandas Law Firm, PC, as co-lead class counsel.

b.      An order finding that Defendants' actions, as set out above, violate RICO, 18 U.S.C. § 1962(a), and constitute Wire Fraud 18 U.S.C. § 1343; violate RICO 18 U.S.C. § 1962(c); and constitute a conspiracy to commit RICO violations, 18 U.S.C. § 1962(d).

c.      An order granting declaratory judgment that the provision in H&H's representation agreements that gives the firm "complete" control over settlement renders the representation agreements void as against public policy.

d.      An order granting declaratory judgment that H&H is not entitled to attorneys' fees sought or collected under the void representation agreements. Alternatively, Plaintiffs and the Class seek a declaration that H&H are only entitled to reasonable fees for work actually performed on behalf of Plaintiffs and the Class that can be proven.

e.      An order finding H&H breached its fiduciary duty to Plaintiffs and the Class and ordering disgorgement of attorneys' fees collected by H&H from Plaintiffs and the Class.

f.      An order finding H&H committed common-law fraud and civil conspiracy.

g.      In the alternative, an order finding H&H was unjustly enriched Defendants were unjustly enriched to the extent actual "administrative expenses" incurred on behalf of the Class were less than the $195 administrative fee and enriched by collection of a contingency fee based upon a void contract.

h.      Judgment against Defendants and in favor of Plaintiffs and the Class for monetary, actual, consequential, and compensatory damages caused by their unlawful conduct.

i.      An award to Plaintiffs and the Class for statutory damages;

j.      An award to Plaintiffs and the Class for punitive damages;

k.      An award to Plaintiffs and the Class for attorney's fees, costs and expenses of suit;

l.      An award to Plaintiffs and the Class for pre and post-judgment interest; and

m.      An award for such other and further relief to which Plaintiffs and the Class may be entitled at law or in equity.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class demand a trial by jury for all issues so triable.

SIGNED: April 14, 2022

Respectfully submitted,


By:    /s/ Mikell A. West
       Mikell A. West
       Texas State Bar No. 24070832
       S.D. Tex. Bar No. 1563058
       Robert W. Clore
       Texas State Bar No. 24012426
       S.D. Tex. Bar No. 2032287
       BANDAS LAW FIRM, P.C.
       802 Carancahua Street, Suite 1400
       Corpus Christi, Texas 78401
       Telephone: (361) 698-5200
       Facsimile: (361) 698-5222
       mwest@bandaslawfirm.com
       rclore@bandaslawfirm.com

       *Attorneys for Plaintiffs Arturo Garza, LaQuinta
       Jones, and Doris Morales, Individually and on
       behalf of all others similarly situated*